DOUGLAS G. WEBBER AND BETTY J. WEBBER, et al., Petitioners [1] v. COMMISSIONER OF INTERNAL REVENUE, Respondent Webber v. Commissioner
Docket Nos. 14500-81, 18431-81, 27393-81, 27409-81, 29564-81, 31096-81, 31099-81, 7228-82, 24614-82
United States Tax Court
T.C. Memo 1983-633; 1983 Tax Ct. Memo LEXIS 159; 47 T.C.M. (CCH) 32; T.C.M. (RIA) 83633; October 12, 1983. Michael P. Casterton and James R. Luppino, for the petitioners. James M. Eastman and Edward I. Kaplan, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: These consolidated cases were assigned to and heard by former Special Trial Judge Darrell D. Hallett pursuant to the provisions of section 7456(c) of the Internal Revenue Code[2] and Rules 180 and 181, Tax Court Rules of Practice and Procedure.[3] The opinion of former Special Trial Judge Hallett was prepared and submitted prior to his resignation on July 1, 1983. The Court agrees with and adopts that opinion, which is set forth below. *163 OPINION OF THE SPECIAL TRIAL JUDGE HALLETT, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years and in the amounts as follows: Addition to Tax
Docket No.
Year
Deficiency
Sec. 6653(a)
14500-81
1977
$13,397.53
1978
$15,650.00
1979
$15,776.00
18431-81
1975
$ 2,853.00
1976
$ 1,174.00
1977
14,170.00
27393-81
1976
$11,640.00
1977
$ 4,472.00
1978
$ 6,810.00
1979
$ 3,530.00
27409-81
1976
$10,904.00
$545.
1977
$ 5,456.00
$273.
1978
$ 6,231.00
$312.
29564-81
1976
$ 4,440.00
1977
$ 2,137.00
1978
$ 1,974.00
31096-81
1977
$ 4,081.00
1978
$ 2,366.00
31099-81
1975
$ 4,195.00
7228-82
1978
$12,839.55
1979
$ 8,981.95
1980
$ 6,375.00
24614-82
1979
$ 960.00
1980
$ 4,981.00
The issues for decision are as follows: (1) Whether petitioners are entitled to investment tax credits and depreciation determined by reference to the contract purchase prices of beaver breeding herds; (2) Whether petitioners are entitled to interest deductions in the amounts paid and designated as interest in their beaver purchase contracts and *164 notes; (3) What is the fair market value of the beavers purchased by petitioners; (4) Whether petitioners had an objective to make a profit in connection with the purchase and maintenance of their beaver breeding herds; (5) Whether petitioners are liable for recapture of investment tax credits with respect to purchased beavers disposed of during the taxable years; (6) Whether petitioners Sypolt and Webber had ordinary income or capital gain from the sale of beavers; and (7) Whether all petitioners except Coker and Moore are liable for the addition to tax provided by section 6653(a) for negligence or intentional disregard of the rules and regulations. FINDINGS OF FACT The issues covered in the trial of these consolidated cases are all related to the petitioners' purchase and maintenance of domestic beaver breeding herds. We will first set forth the facts common to the beaver industry as a whole, and then find facts pertaining to each individual petitioner. The parties have agreed that all of the testimony and exhibits received during the trial of these cases may be considered as evidence in each individual case. Some of the facts have been stipulated, and are found *165 accordingly. From the days of exploration and development of North America, there has been a significant industry based upon the production, marketing, and manufacture of beaver pelts. The majority of pelts are trapped in the wild by thousands of small producers. Others are taken from beaver bred and raised on various ranches located in the western United States. Beaver pelts are marketed by producers through auction outlets and large skin dealers and are made into consumer products by manufacturers, most of which are located in Europe and, to a lesser extent, New York City. From 1970 through 1980, the number of beaver pelts marketed annually in Canada ranged from approximately 350,000 to 600,000, with a total value of from 4.5 to 26 million dollars. During the same period, the number of pelts marketed in the United States ranged from 100,000 to 450,000 annually with pelt values of from 1 to 17.5 million dollars. End products made from beaver include coats, hats, gloves, vests, purses, pillows, and bedspreads. The market for beaver pelts is part of the fur market which includes fox, mink, chinchilla, muskrat, and racoon. Although these animals, like beaver, are all trapped *166 in the wild, some have been raised domestically and bred on fur farms for a number of years. For example, much of the mink production in North America is raised and bred on farms. In 1922, the United States Department of Agriculture published a bulletin suggesting the possibility of domestic beaver farming. The earliest known experiment in actually raising and breeding beaver commercially occurred in 1925 ween Mark L. Weaver placed a number of wild beaver in a fenced area located in Salt River Canyon, Wyoming. That experiment turned out to be a failure, but over the years Mr. Weaver and others continued experimenting with raising and breeding beaver in various situations. By the 1950's, ranches were in operation which utilized individual pens, generally made primarily of concrete with a water flow area, covered nest box, feeding facilities, and an enclosed environment sufficient to house a breeding pair of beaver and their kits. One of the early ranches, built in 1952 near Hamilton, Montana, is still in existence today. By the mid-1960's Mr. Weaver and his associates had formed a sales organization and developed a sales program to provide a means for beaver owners to list *167 their animals for sale and attempt to bring more investors and owners into the industry. By 1966, there were approximately 80 beaver ranches and a total of approximately 18,000 animals on the ranches. In 1966, the Securities and Exchange Commission conducted an investigation of the Weaver sales organization which culminated in the organization and the individuals associated with it being enjoined from future sales activities. Within 2 to 3 years of the issuance of the injunction, the number of beavers on ranches dropped drastically from approximately 18,000 to less than 4,000. Many of the owners of the ranches simply left the beavers to die from starvation in their pens. Others were turned loose in the wild and some were killed because the operator of the ranch could not feed the animals and the owners of the beaver were not paying the ranch operators for feed. The number of ranches and beavers began to increase again in the early 1970's to the point that there were approximately 10,000 beavers on various ranches by 1976. In 1968, the Western Beaver Breeder's Cooperative Association (WBBCA) was formed. WBBCA, since that time, has operated as a marketing and agricultural cooperative. *168 Its members are beaver owners and ranch operators. It functions as a service organization, handling the collection of feed bills, keeping detailed records of each owner's beaver herds, and engaging in marketing activities. Individuals associated with and principally involved in the activities of WBBCA from 1970 through 1976 included Dennis Crum, Paul Sharp, Jerry Milligan, and Mac Roundy. In 1976 or 1977, the individuals associated with WBBCA essentially split into two groups.The group remaining with WBBCA had the view that it was then time to start pelting on a fairly heavy basis, make the pelts into garments, and market the garments. The other group, whose members became associated with an organization which had been formed in 1974 and with the name of Western Beaver Farms Limited (WBF), had the philosophy that more years of selective breeding and genetic development were necessary before intensive pelting should be commenced. WBF is a general partnership with nine partners including Dennis Crum and Mac Roundy. After the 1977 division, Mac Roundy and Dennis Crum were primarily involved with WBF. Jerry Milligan retained his association with WBBCA. WBF, like WBBCA, functions *169 as a service organization for owners and ranchers. Since 1950, detailed records have been maintained with respect to beaver kept on the ranches. In 1964, recordkeeping was computerized. Each of the petitioners involved in these cases received a computer listing of their animals at the time of purchase. Thereafter, they received quarterly ranch reports accounting for births, deaths, and dispositions of animals. Included in the information maintained on these records for each beaver is a tattoo number; the ranch and pen location of the animal; the sex; the age; its litter size; characteristics of its fur; and its breeding and reproductive history.
During the early to mid-1970's, many beavers were sold to individual investors on terms and at stated sales prices substantially similar to those described below with respect to the beavers purchased by the petitioners involved in these cases. Typically, purchases were made of a breeding herd of 10 to 40 pairs of adult beavers, some of which had previously produced one or more litters ("proven") and some of which had not yet produced offspring ("nonproven"). It was also common practice of the sellers to include with the purchased adult *170 beavers the current year's kit crop of those beavers, i.e., young immature beavers. After the beavers were purchased, they were kept on behalf of the owners on ranches located in Montana, Idaho, Utah, Arizona, and Wyoming. Some of these ranches have been operated by the American Canadian Beaver Company (ACBC) which is and has been a corporation owned by members of the Weaver family and Jerry Milligan. The size of the ranches varied from 120 to 500 beaver pens. Throughout the 1970's to the present date, a principal ranch operated by ACBC has been the ranch located near Hamilton, Montana. It currently has approximately 385 pens. The Hamilton ranch is managed by Jerry Milligan. As of 1977 or 1978, there were approximately 17 ranches serviced by WBF located in Montana, Arizona, Utah, and Idaho. Currently, there are 13 such ranches. Most of these ranches are approximately 20 years old. Each ranch has a full-time manager on the premises, and Mac Roundy serves as an overall manager and supervisor. As of 1980 there were approximately 5,000 beavers on ranches associated with WBBCA. The ranches consist of individual beaver pens of approximately 6 feet by 6 feet. The 4-foot *171 walls are constructed of either galvanized steel or cement. A cement tub 26 inches wide and the length of the pen is filled with water which runs continuously through the pen 24 hours a day. The animals have a raised cement feeding platform and shake-off den which is covered at the top. Attached to each pen is an "S" box, also constructed of cement, with a wooden lid lined with galvanized steel to prevent escape of the animals. The "S" box is where the beavers sleep and give birth to their young. The beavers shred fresh wood each night to replace the bedding for their nests. Ranch managers and ranch hands clean the pens daily, provide fresh green wood periodically, and provide feed consisting of pellets of hays and grains. Vaccines are administered to diseased animals and, in the case of more severe diseases, veterinarians are called in. Since 1975, significant death losses have been experienced due to disease, including tularemia and leptospirosis. Ranchers have from time to time obtained the assistance of university veterinary schools in attempting to diagnose and control these diseases. All animals are tattooed beginning in September of the first year of their life. *172 The tattoo is placed on the web of the left foot with numbers indicating the sex of the animal, the year of birth, and the ranch on which it was born. After they become yearlings, the animals are weighed and graded. Grading is done for "general" characteristics including the animals' physical condition and overall body conformation and for the texture, thickness, color clarity, curl and overall appearance of fur and guard hair. From the weight of the beaver a "size" code is assigned it. After yearlings are weighed and graded, a genetic history is developed for them. This history consists of records of the animal's ancestors back to and including the great grandparents, and includes information concerning color, size, litter size, general and fur characteristics of the descendents, and the progenitor. In the months of November and December, the yearling beavers are mated and put into pens as pairs. Computer selection techniques are utilized in connection with the mating process to take into account geneology histories, color, size, fur, and general characteristics. Periodically, portions of each herd are "pelted," which involves killing, skinning, stretching, and fleshing *173 of the pelt. The pelts are maintained in refrigerated storage lockers. The ranch managers periodically make recommendations to individual beaver owners and seek the permission of the owners to pelt certain beavers contained within the herd. Pelt recommendations are made for purposes of removing undesirable animals ("culls"), to develop certain genetic characteristics, reduce overcrowded conditions, and to produce revenue through the manufacture and sale of the pelts. Some, but by no means all, of the pelting recommendations are accepted by the owners. A significant problem in the industry, particularly in the late 1970's, was the failure of owners to maintain control of the size and quality of their herds through consistent and proper pelting practices. Both the WBBCA and WBF billed beaver owners a monthly charge for feed and care of the animals maintained on the ranches associated with each organization. The monthly charges made by both groups for the years 1972 through 1976 were $4 per month for kits, $6 per month for yearlings, and $6 per month for adults. In 1977 and 1978, charges were $5 per month for kits, $6 per month for yearlings, and $6 per month for adults. WBF increased *174 its charges in 1980 over the 1977--1978 amounts to $6 per month for kits, $7 per month for yearlings, and $8 per month for adults. In 1980 WBBCA increased its monthly charge for both yearlings and adults to $7.Kit charges were imposed for the months of September, October, November, and December only. Prior to December 1981, neither WBF nor WBBCA charged separately for pelting. However, in the case of WBBCA, if pelts taken were marketed through WBBCA, the WBBCA would pay the pelting expense and add it to other expenses incurred in marketing the pelts, prior to crediting or remitting any net proceeds to members. Beginning in December 1981, WBF imposed a charge of $10 per pelt for pelting and WBBCA charged $5 per pelt. WBBCA has, since 1970, engaged in marketing activities on behalf of its members.In 1973, Dennis Crum, on behalf of WBBCA, visited fur distributors and manufacturers in New York City, Italy, and London, and he attended the Frankfurt Fur Fair. Mr. Crum reported the results of his trip to the WBBCA Board of Directors, and the Board in turn distributed the information to members. In connection with these trips, Mr. Crum received some encouragement regarding the potential *175 for marketing domestic beaver pelts, but was told on several occasions that furriers were not interested in small lots of skins and that Mr. Crum and his organization should develop herds of sufficient size to present large quantities of pelts for marketing, with consistent quality and color. In 1974, WBBCA had some 820 members' beaver pelts offered for sale at the Hudson Bay fur auction in Montreal, Canada. The pelts were offered for sale along with wild beaver pelts on numerous occasions throughout 1974 and 1975. Although most of the pelts were eventually sold, the results of the sale were basically disappointing. WBBCA received a high of $55 per pelt for larger better grades and as low as $2 per pelt for culls and smaller pelts. Since 1974, the Board of Directors and management of both WBBCA and WBF has had the view that, to be successful, domestic beaver producers should by-pass the auctions and fur exchanges where most wild beaver pelts are initially sold and instead promote their products and sell direct to large dealers, manufacturers, and retailers. In 1977, the WBBCA Board of Directors investigated the possibility of opening a retail store to sell beaver products *176 in a new shopping mall located in Modesto, California. Although design and market studies of the proposed store were made and there were preliminary negotiations for the lease of space, the Board ultimately decided not to go through with the project. In 1974, WBBCA established a Retail Marketing Committee to promote the manufacture, distribution, and retailing of beaver products. Initial marketing efforts were made through Nicholas Theohar, a well-known New York City garment manufacturer, and National Superior of Chicago, which did the dressing of the pelts. Coats were produced and sold at retail by Buffins, Bullocks, Marshall Field, and Bloomingdale stores in San Francisco, Chicago, and New York City. WBBCA manufactured approximately 95 garments using 858 pelts in the 1976--1977 manufacturing year. As of September 1980 it had sold all of those garments. WBBCA paid its members $12.13 for each pelt harvested and marketed in the first pelt promotional effort. For the 1977-1978 manufacturing year, all of the garments produced (32) were sold and produced a small profit averaging $2.04 per pelt manufactured. During the 1978--1979 manufacturing year, 13 garments were manufactured *177 using 153 pelts of which I remained unsold in September 1980. This production produced an average net gain per manufactured pelt sold of $34.70. For the 1979--1980 manufacturing year, garments sold produced a net gain per pelt manufactured of approximately $36.18 and as of November 1981, WBBCA had in inventory approximately $5,200 of the $27,780.78 in goods manufactured. In 1980, the WBBCA Board of Directors decided to sell at the Ontario Trappers Association auction many harvested pelts which were then held in storage. The WBBCA pelts were sold at the auction along with wild pelts in May 1980 and again on March 4, 1981. There were 138 pelts sold in May 1980 with the best price received being $40 (Canadian) per pelt.At the March 4, 1981, auction, 465 pelts were sold for a price of $15 (Canadian) per pelt. In 1982, WBF sold pelts to Neiman-Marcus. There were 270 beavers pelted for this sale, and 149 beavers were actually selected by Neiman-Marcus for purchase and manufacture into finished garments. The net price paid to WBF for the pelts purchased was $14,400. WBBCA and WBF made frequent and regular mailings in the form of newsletters to owners concerning matters related *178 to operation of the ranches, marketing, and manufacturing of pelts.Each of the petitioners in these cases has received, throughout the period of ownership and maintenance of their beaver herds, regular correspondence from these organizations. By-products resulting from the raising and harvesting of the beavers include meat, tails, and castor. No significant market to date has been developed for those by-products and during the period relevant to these cases little or no income was derived from the marketing of the products. Since 1974, Paul Sharp has entered into approximately 40 sales transactions wherein he sold herds of adult ranched beavers to individual investors. The sales were made on terms providing that the purchasers had the option of making a substantial portion of the designated principal payments in-kind with beavers rather than in cash. The stated herd sales prices were based upon prices of $1,750 per beaver, or $3,500 per pair, for proven adults; $1,200 ($2,400 per pair) for nonproven adults; and $500 per pair for yearlings. The amount to be applied against the unpaid principal in the case of payments in-kind on the contract price was based upon the same values *179 for proven, nonproven, and yearling beavers as those used in determining the purchase price. During 1971 through 1979, sales transactions were made to 92 individual investors by Dennis Crum for herds of proven and nonproven adult ranched beavers. The terms of sale were substantially the same as those involved in the sales made by Paul Sharp. The stated contract sales prices were $3,500 per pair for provens and $2,400 per pair for nonprovens, except for some sales in 1975 for stated prices of $3,250 and $2,250 for proven and nonproven pairs, respectively. Most of the beavers sold by Dennis Crum for the years 1972 through 1977 were beavers acquired in cash transactions included in those referred to below.Similarly, beavers sold by Paul Sharp during the years 1974 through 1978 were ones that he had purchased for cash during the same period in transactions included in those described below. During the years 1972 through 1976, the following purchases of beavers, all for cash, were made by Dennis Crum: No. of Beaver
Price Per
Purchased
Seller
Total Price
Beaver
26 pair
Dean Witt
$ 2,600.00
$ 50.00
4 beavers
Dean Witt
$ 400.00
$100.00
26 beavers
Dean Witt
$ 2,400.00
$ 92.31
105 beavers
Dean Witt
$ 9,050.00
$ 86.19
156 beavers
Vining
$21,076.00
$135.10
119 beavers
Beall
$16,500.00
$138.66
71 beavers
Neuenswander
$ 2,150.00
$ 30.28
40 beavers
ACBC
$ 4,000.00
$100.00
66 beavers
Freeland
$ 3,100.00
$ 46.97
128 beavers
Bosch
$ 2,190.00
$ 17.11
92 beavers
Rouche
$ 2,900.00
$ 31.52
29 beavers
Neuenswander
$ 1,500.00
$ 51.72
16 beavers
Mac Roundy
$ 1,600.00
$100.00
103 beavers
Dean Witt
$ 6,630.11
$ 64.37
21 adult beavers
Dean Witt
$ 2,100.00
$100.00
13 yearlings
Dean Witt
$ 650.00
$ 50.00
132 beavers
Myers-McLoraine
$ 8,000.00
$ 60.61
23 beavers
Belger
$ 2,300.00
$100.00
15 beavers
Miya
$ 1,500.00
$100.00
7 beavers
Mac Roundy
$ 875.00
$125.00
17 beavers
Mac Roundy
$ 2,125.00
$125.00
20 beavers
ACBC
$ 2,000.00
$100.00
36 beavers
Harper
$ 3,500.00
$ 97.22
31 beavers
Harper
$ 3,000.00
$ 96.77
*180 Dennis Crum returned cash during 1973 to individuals who had previously purchased beavers on contracts from him and with whom he entered into an agreement to rescind the contract. The individuals and number of beavers involved and cash returned are as follows: Beavers
Cash
Cash Returned Per
Purchaser
Received
Returned
Beaver Received
Richardson
9
$3,500
$388.89
Burr
56
22,773
406.67
Watkins
39
7,809
200.23
King
51
7,809
153.12
Horowitz
28
28,000
1,000.00
Brubaker
30
7,809
260.30
Leming
19
1,900
100.00
Klingerman
16
3,300
206.25
In 1974, Dennis Crum entered into a recision agreement with Vierra where Vierra returned 30 beavers previously purchased from Dennis Crum and Dennis Crum repaid Vierra $8,835. That amounts to an average of $294.50 per beaver. During the period 1974 through 1978, D Bar C Ranches, Inc. (an entity with which Mr. Crum was associated), made the following cash purchases: No. of Beaver
Price Per
Purchased
Seller
Total Price
Beaver
20 beavers
Wally Whitehead
$ 775
$ 38.75
19 beavers
Ray Sanford
$4,750
$250.00
26 beavers
Charles Barber
$6,500
$250.00
41 beavers
Bauer
$4,100
$100.00
*181 During the years 1975 through 1978, Paul Sharp made the following cash purchases of beavers: No. of Beaver
Total
Purchased
Seller
Price
Price Per Beaver
200 beavers
Cal-State Beaver
$20,000.00
$100.00
Ranches
38 adult and
16 yearlings
Dr. Leon Ellis
$ 2,000.00
$ 40.00 adults
30.00 yearlings
16 adults
Bessie Goodman
$ 840.00
$ 50.00 adults
2 yearlings
Dr. Heslov and
$ 20.00 yearlings
6 beavers
Dr. Laxineta
$ 150.00
$ 25.00
27 adults and
6 yearlings
Gene Vining
$ 1,750.00
$ 53.03
116 adult and
119 kit
beavers
ACBC
$15,000.00
$100.00 adults
$ 30.00 100 kits
$ 25.00 4 kits
$ 20.00 15 kits
21 beavers
Mac Roundy
$ 1,050.00
$ 50.00
7 adults and
5 yearlings
Clayton Marshall
$ 800.00
$ 66.67
60 adults,
6 kits, and
10 pelts
Ray Sanford
$ 3,000.00
$ 39.47 (average)
120
Brownlee Land
$12,000.00
$100.00
and Cattle Co.
20
Reed Jensen
$ 2,000.00
$100.00
46 beavers
Dr. James Bruffy
$ 2,000.00
$ 43.48
34 beavers
Marion Roueche
$ 1,360.00
$ 40.00
6 beavers
Larry Taylor
$ 300.00
$ 50.00
263 beavers
Sheriff's Lien
Sale
$22,709.15
$ 86.35
13 beavers
Frank Miya
$ 224.95
10 beavers
Norcross
$ 160.00
$ 16.00
10 beavers
ACBC
$ 1,250.00
$125.00
14 beavers
Mac Roundy
$ 1,400.00
$100.00
4 beavers
Brownlee Land and
Cattle Co.
$ 400.00
$100.00
12 adults and
4 kits
Reed Jensen
$ 1,100.00
9 beavers
Darius Badgley
$ 162.00
$ 18.00
76 beavers
Jerry Milligan,
Mark & Don Weaver
Trust, and ACBC
$ 7,500.00
$ 98.68
40 beavers
Marion Roueche
$ 1,600.00
$ 40.00
14 adults and
Brownlee Land and
11 yearlings
Cattle Co.
$ 475.00
$ 19.00 (average)
20 adults and
3 yearlings
Dr. Diorio
$ 2,500.00
Approximately
plus
$100.00
assumption
of feed
bill
7 beavers and
progeny
D. D. Tomlinson
$ 269.91
$ 38.56 (ex progeny)
1 beaver
ACBC
$ 100.00
$100.00
15 beavers
Stephan Hofman
$ 1,700.00
$113.33
13 beavers
William Heitman
$ 1,120.00
$ 86.15
16 adults and
Brownlee Land and
10 kits
Cattle Co.
$ 1,600.00
$100.00 per adult
17 beavers
Donald Montez
$ 2,000.00
$117.65
30 beavers
Marion Roueche
$ 1,350.00
$ 45.00
17 beavers
Dr. Diorio
$ 1,850.00
$108.82
76 beavers
Robert Young
$ 6,460.00
$ 85.00
46 beavers
ACBC
$ 5,150.00
$111.96
70 beavers
Joe Machado
$ 5,685.00
$ 81.21
*182 In January 1978, Calvert A. and Delores Tanson sold 6 adult beavers to John Lane for $900 ($150 per beaver). In 1977 Robert J. and Joyce L. Palmaymsea sold 13 beavers born in 1974 for $1,425 ($109.62 per beaver). In mid-February 1980, Marshall Industries, Inc., purchased for cash all the beavers then standing in the account of Merle W. Bowman for the assumption of approximately $372 in feed bills and cash amounting to $18 per beaver born in 1979, $36 per beaver born in 1978, and $52 per beaver born prior to 1978. In 1977, D Bar C Ranches, Inc., transferred whatever interest it had in 23 installment obligations pertaining to beaver purchase contracts to the Hylands Church of Christ.After the transfer, the obligors on these installment obligations made payments in-kind pursuant to the terms of the indebtedness involved. As of April 2, 1979, David P. Himes, acting on behalf of the Hyland Church of Christ, had sold all of the beavers received in connection with the installment obligations for $100 per beaver. Most of the beavers sold were nonprovens. The purchasers of these beavers included Mac Roundy and Richard Rafter. In all sales of beavers by Paul Sharp and Dennis Crum *183 (when made by them as agent or principal) to the petitioners involved in these proceedings, the seller guaranteed replacement of and/or customarily replaced any "purchased" beaver which might die within at least the first year after the sale. In fact, it was a frequent practice to replace owner's death losses which occurred after the first year following the initial purchase, especially where a ranch experienced significant numbers of death losses due to extraordinary weather or disease. The record does not establish the extent to which death loss replacements after the first year following purchase were made by ranch owners and/or operators, or by the sellers. In connection with their sales of beaver on contract to individuals, including the petitioners involved in these cases, Dennis Crum and Paul Sharp supplied the prospective investor with a document entitled "Beaver - The Diamond of Fur" and a separate set of documents illustrating projected financial results of the purchase and maintenance of a beaver breeding herd. The document entitled "Beaver - The Diamond of Fur" contained information concerning the history, growth, and development of the market for beavers; a description *184 of domestic beaver ranches and the activities of the cooperative association; and representations concerning the economics of beaver ranching.With respect to the latter subject, representations were made that the profitability and value of ranched beavers would be realized through the beavers' reproductive potential; through development of a market distinct from the wild fur market; and through development, by controlled breeding and genetic selection techniques, of a consistent supply of pelts of uniform quality and distinct color and fur characteristics. In fact, the industry has, to date, been largely unsuccessful in achieving the objectives discussed in the above document. Ranched beaver pelts sold from 1974 through 1980 through the Canadian Fur auctions have not brought any greater prices than wild beaver pelts. Although there have been direct sales to manufacturers and distributors and the products of ranched beaver pelts have been sold at retail, as previously set forth in these findings, these sales activities and the production associated with them have not reached a volume and consistency necessary to produce a profit to beaver owners. The financial projections furnished *185 to prospective investors in contract purchases of breeding herds, including the projections furnished to petitioners in these cases, illustrate the income, expenses, tax deductions, tax savings, and cash flow resulting from the purchase of a herd ranging in size of from 10 to 60 pairs. Each projection covers an 11 or 12-year period, beginning with the year of purchase and ending with the year the purchase contract is fully paid. Each projection shows substantial income tax losses during the first 6 or 7 years. During this period, no significant revenue is forecasted as the herd size is being increased; depreciation deductions are shown calculated upon the contract price, as well as investment tax credits in the year of purchase. Negative cash flow (exclusive of tax savings which maintain positive cash flow) is shown during the first 4 or 5 years, resulting from cash principal and interest payments and feed costs. Generally increasing positive cash flow is shown after 4 or 5 years as revenues from pelt sales are projected to exceed expenses, and, in the case of most of the projections, principal payments are shown as being made with beavers. Likewise, after the seventh year taxable *186 income is shown for each year, although for the total period covered, cumulative tax losses in the first 7 years substantially exceed cumulative taxable income shown for the following years.
A sizeable herd is shown to exist at the end of the 11 or 12-year period covered, ranging from 178 head for an original 10 pair purchase to 372 head for a 60 pair purchase.The projections show the additional revenues that could be realized if the owner ceased operating at that time and pelted the entire herd; for that purpose, pelt prices of from $65 to $81 are utilized. The forecasts utilized reproductive rates at from 2, 3, to 4 kits per pair of proven beavers in the herd, with the rate increasing over the term of the contract. Death losses were estimated at 5 percent for adults and 10 to 15 percent for kits (including culls). The forecasts included a statement that the information contained therein was "deemed reliable but not guaranteed," and it included "matters of opinion," and that material involving future transactions and happenings "are subject to and are contingent upon presently unforeseeable developments." Prospective buyers were cautioned to "contact their own accountant or *187 lawyer for accounting or legal advice." The actual kit production rate of WBBCA and WBF since 1975 has been less than the rates forecasted in the prospectuses. For WBF ranches, the rates have averaged 2.7 to 3.3 kits per proven pair carried. WBF management believed that a rate of at least 3.0 live kits per adult female carried should be a goal to make the beaver business viable on a pelting basis. The death loss rates during the late 1970's experienced by the Hamilton ranch was 8.5 percent for kits and another 1.5 to 2 percent by the time the animals reached breeding age. Overall herd death rates for kits from all WBF ranches were 17 to 18 percent for the years 1974 through 1978, 35.7 percent for 1979 and 32.7 percent for 1980. PETITIONERS. 1. Glenn A. and Charlotte K. Coker
Petitioners Glenn A. and Charlotte K. Coker were residents of Modesto, California, at the time their petitions were filed. Since 1973, petitioner Glenn A. Coker (hereinafter petitioner) has been employed full-time as a manager of a discount furniture store in Modesto. In early 1975, petitioner learned of the potential to invest in beavers through John Lane. Mr. Lane is and was a certified *188 public accountant. He had been doing accounting work for petitioner since 1974. Mr. Lane had numerous clients other than petitioner who either considered or actually invested in beavers, and who consulted him in that regard. Mr. Lane had obtained a prospectus concerning the projected income, expenses, tax benefits, and other financial aspects of an investment in beavers and he had discussions with Dennis Crum, Mac Roundy, and one or two other individuals involved in beaver ranching at the time concerning the assumptions and estimates in the projections. Petitioner and Mr. Lane met with Paul Sharp and discussed with Mr. Sharp the financial aspects of a beaver herd purchase, and petitioner then decided to acquire a beaver herd. On July 17, 1975, a promissory note, security agreement, and bill of sale were executed concerning the purchase by petitioner from Paul Sharp of 16 adult and 4 yearling beavers. Although not included in the documents of sale, petitioner also received 18 beaver kits as a result of his purchase agreement. The total price was $30,600, which was based upon a value of $3,500 per pair of proven and $2,400 per pair of nonproven beavers. The promissory note was *189 for the full purchase price. It provided for principal payments of $612 on or before December 31, 1975, 1976, and 1977; $1,224 on or before December 31, 1978; $2,400 on or before December 31, 1979; $4,800 on or before December 31, 1980; $2,400 on or before December 31, 1981, and December 31, 1982; $7,200 on or before December 31, 1983; and $8,200 on or before December 31, 1984. Although the note provided for 10 percent interest until principal was fully paid (which could be prepaid up to one year in advance) it was understood at the time the note was executed that interest was to be paid only during the first 4 years. Principal and interest was payable in "lawful money of the United States" and "at the option of the undersigned in beaver." If beaver were used to make payments the animals were to be valued at the following rates: proven pairs, $3,500; nonproven pairs, $2,400; and yearling pairs, $500. A "proven pair" was defined as a pair that had borne and raised young in the past; a nonproven pair as a pair of animals of breeding age which had not borne or raised young; and a yearling pair as animals of nonbreeding age in the first calendar year of life. The following schedule *190 shows the payments made by petitioner in connection with his purchase and ownership of the beavers: Year
Principal
Interest
Feed
1975
$ 612.00
$2,937.00
$ 775.60
1976
$ 612.00
$2,937.41
$2,971.41
1977
$ 612.00
$ 240.00
$3,586.82
1978
$1,224.00
$2,754.00
$2,956.01
$2,400.00 (in-kind)
1979
$2,241.81
1980
$2,087.94
1981
$4,800.00 (in-kind)
$2,416.02
1982
$9,400.00 (in-kind)
$2,146.28
In 1983, petitioner made a final payment (in-kind) of $10,800 which paid off his contract. In connection with the principal payments in-kind referred to above, petitioner reported on his income tax returns for the year of payment the amount of payment in-kind as long-term capital gain. Petitioner and his wife have been members of WBBCA since 1975. Petitioner was director and president of WBBCA in 1982 and was secretary and director in 1981. Petitioner has been a shareholder of the "Afton Ranch" since 1975 and has been Afton's general manager since 1981. The Afton Ranch, until it ceased operating in early 1982, was one of the ranches on which beavers were raised and maintained. Petitioner had pelted almost all of the kits born *191 to his herd in 1978, 1979, and 1980. The total amount received by petitioner from pelts in 1977 and 1978 was $161.27. As of March 30, 1980, petitioner had 24 adults in his beaver inventory. As of January 1, 1983, he had 11 adults and 7 yearlings. During the years 1977 through 1980, the following death losses occurred with respect to beavers purchased by petitioner in 1975: No. of
Year
Death Losses
1977
1 proven
1978
3 proven
2 nonproven
1979
2 proven
1980
2 proven
2 nonproven
Petitioners did not report investment tax credit recapture with respect to the death losses, except in the case of 1 proven beaver lost during 1979. On their Federal income tax returns for the years 1977 through 1980, petitioners claimed the following deductions with respect to their purchase and ownership of beavers: Year
Depreciation
Feed
Interest
1977
$3,837
$3,587
$ 240
1978
$6,545
$2,956
$2,754
1979
$1,938
$2,518
1980
$1,320
$2,482
In his notice of deficiency for 1977 and 1978, respondent (1) disallowed entirely the depreciation claimed on petitioners' returns with respect to the beavers purchased on the ground that petitioners *192 had failed to establish that the beavers existed or that petitioners had an ownership interest in them during the taxable year or, in the alternative, that petitioners had failed to establish basis in excess of $150 and $100 for proven and nonproven beavers, respectively, that the purchase contract was a contract entered into for profit, that the purchase contract had economic substance, or that the purchase contract represented a bona fide debt obligation; (2) disallowed interest expense of $240 for 1977 and $2,754 for 1978 on the ground that petitioners had failed to prove that the beavers existed, or that they had an ownership interest in the beavers, or, in the alternative, that a substantial amount of the interest claimed in fact was a capital expenditure; and (3) determined that investment credit of $3,060 claimed for 1975 should be recaptured in full for 1977. At trial, respondent conceded that petitioners must recapture investment credit only to the extent of dispositions occurring during the years in issue. In an Amendment to Answer filed on December 17, 1982, respondent asserted that (1) the deductions claimed for feed expense on the 1977 and 1978 returns should be disallowed *193 in full because petitioners did not have an ownership interest in the beavers, the beaver activities were not entered into for profit, and petitioners did not purchase beavers or secure feed and care for the animals; and (2) petitioners are liable for investment tax credit recapture with respect to dispositions of purchased beavers during the years in issue in the amount of at least $940. Respondent requested that the Court determine increased deficiencies resulting from the additional matters raised in the Amendment to Answer. In the statutory notice for the calendar years 1979 and 1980, respondent (1) disallowed the depreciation claimed on the returns with respect to beavers purchased on the ground that petitioners had failed to establish a bona fide ownership interest in the beavers, that they held the beavers for use in an activity entered into for profit, that the beaver activities had economic substance, or, in the alternative, that the beavers had a basis in excess of $2,600; (2) disallowed feed expense deductions claimed for both years on the ground that petitioners had failed to establish an ownership interest in the beavers, or that the feed expenses were incurred, or, *194 if incurred, were incurred as part of an activity entered into for profit; and (3) that, in the alternative, petitioners had income in the amounts of $2,400 and $4,800, respectively, for the taxable years 1979 and 1980 by reason of failure to make principal payments called for in their contract for those years; at trial, respondent conceded this adjustment. 2. Harvey E. and Beverly J. Hartman
Petitioners Harvey E. and Beverly J. Hartman were residents of Fresno, California, at the time their petition was filed. Petitioner Harvey E. Hartman (hereinafter petitioner) is and has been during all times relevant to this case a practicing Certified Public Accountant. Two of petitioners' associates in his accounting practice, Thomas McFerson and Ronald Reuther, invested in beavers in 1976 with petitioner. Petitioner and his associates learned of the possibility of investing in beavers from Gary Smith, who was a friend of Mr. McFerson's. Mr. Smith had previously purchased beavers from Mr. Crum, and was then maintaining a beaver herd.
Petitioner and his associates met with Mr. Crum and were provided a financial projection and information concerning the beaver industry, including *195 some sample manufactured garments. After receiving this information, petitioner and his associates discussed the information with Mr. Smith, and they met again with Mr. Crum and reviewed computer records regarding the composite of animals to be included in their herd.
On July 17, 1976, a Beaver Purchase Contract, security agreement and promissory note were executed by petitioner, Mr. McFerson, and Mr. Reuther, acting in the name of HMR Investments, whereby they acquired as tenants-in-common from D Bar C Ranches, Inc., 20 pairs of adult beavers for a total stated purchase price of $61,200. The price was based upon a value of $3,500 per pair of proven and $2,400 per pair of nonproven beavers. The promissory note, in the full amount of the purchase price, provided for interest at the rate of 10 percent per annum "but not beyond October 2, 1979," and further provided that interest would be waived for any year that principal was paid in beaver. It provided that after 4 years the principal of up to $3,500 per year could be paid in beaver. If beaver were used to make payments they were to be valued at $3,500, $2,400, and $500 for proven, nonproven, and yearling pairs, respectively. The *196 principal payments were to be made as follows: On or before December 31 of each of the years 1977 through 1979, $2,448; on or before December 31 of each of the years 1981 through 1986, $2,000; and the remaining balance within 2 years. The contract provided that the seller warranted that the animals supplied to the buyers were healthy and agreed to replace free of charge any adult animal which died before July 1, 1977. "Proven" and "nonproven" animals were defined the same as in petitioner Coker's contract. Although not included in the documents of sale, petitioner and his associates received 23 beaver kits as a result of their purchase agreement. The following is a schedule of payments made by petitioner and his associates with respect to their purchase and ownership of beavers: Year
Interest
Principal
Feed
1976
$6,120
$1,109
1977
$2,937
$2,448
$3,533
1978
$5,630
$2,448
$2,220
1979
$5,385
$2,448
$2,050
1980
$2,937
$1,853
1981
$3,500 (in-kind)
$1,948
1982
$2,200 (in-kind)
$1,792
During 1976 through 1977, the following number of beavers petitioner and his associates acquired in 1976 died or were otherwise disposed of: *197 Year
Death Loss or Disposed of
1976
2 proven
1977
4 proven
2 nonproven
1978
5 proven
3 nonproven
Between 1977 and 1982, replacements were made for the beaver death losses sustained by the herd owned and maintained by petitioner and his associates in the total amount of 31 animals. As of December 31, 1982, petitioner and his associates had 32 adult beavers in their inventory. Petitioners claimed an investment tax credit on their 1976 return of $2,040 with respect to their purchase of beavers during the year. No investment tax credit recapture or reduction in credit for animals disposed of was reported by petitioners on their 1976 or 1977 returns. Recapture was reported on petitioner's 1978 return with respect to 3 proven and 1 nonproven beavers (with 2 animals reported as sold and 2 deaths). On their Federal income tax returns for 1976 through 1978, petitioners claimed the following deductions with respect to the purchase and ownership of beavers: [4]
Year
Depreciation
Death Loss
Feed
Interest
1976
$5,849
$1,020
$ 621
1977
$3,278
$1,999
$1,674
1978
$2,405
$537
$1,877
$2,224
*198 In his notice of deficiency for the calendar years 1976, 1977, and 1978, respondent (1) disallowed entirely the depreciation claimed on petitioners' returns with respect to the beavers purchased on the ground that petitioners had failed to establish that the beavers existed or that petitioners had an ownership interest in them during the taxable year, or, in the alternative, that petitioners had failed to establish basis in excess of $2,448, that the beaver purchase contract was a contract entered into for profit, that the purchase contract had economic substance, or that the contract represented a bona fide obligation; (2) disallowed interest expense claimed on the returns for all 3 years because the petitioners had not established that the beavers existed or that they had an ownership interest in the beavers, or, in the alternative, that a substantial amount of the interest claimed was in fact a capital expenditure; (3) disallowed investment tax credit of $2,040 for 1976 on the ground that petitioners had not established that the beavers existed or that they had an ownership interest in them, or, in the alternative, that the qualified investment upon which the investment credit *199 could be taken was less than the amount claimed on the return; and (4) disallowed the death loss claimed on petitioners' 1978 return because of petitioners' failure to establish that the beavers existed or that they had an ownership interest in them. In an Amendment to Answer filed on December 17, 1982, respondent asserted that (1) the deductions claimed for feed expense by petitioners for the years 1976 through 1978 should be disallowed in full because petitioners did not have an ownership interest in beavers, the beaver activities were not entered into for profit, and petitioners did not purchase or secure feed and care for such animals; (2) beaver dispositions took place during the years in issue which give rise to recapture of the investment credit; and (3) petitioners are liable for the addition to tax provided by section 6653(a) for negligence or intentional disregard of the rules and regulations. Respondent requested that the Court determine increased deficiencies resulting from the additional matters raised in the Amendment to Answer. 3. Michael G. and Darlene S. Sypolt
Petitioners Michael G. and Darlene S. Sypolt were residents of Sacramento, California, at the *200 time their petition was filed. Petitioner Michael G. Sypolt (hereinafter petitioner), is and was, during the years relevant to this case, a Certified Public Accountant associated with a medium size regional accounting firm. Petitioner's firm specializes in accounting, tax, and investment oriented services. In 1974, petitioner became aware of the possibility of investing in beavers through discussions with one of his clients, Mr. Moore, who had purchased and was then maintaining a beaver herd.During 1975, petitioner undertook an investigation of the industry with a view towards investing in it himself. Aside from obtaining financial projections, petitioner met and had discussions with Mr. Crum and Mr. Roundy, and he visited one of the ranches as well as the Salt Lake City office where the computer ranch records were maintained. On December 29, 1975, petitioner entered into a Beaver Purchase Contract, security agreement, and promissory note concerning the purchase of 20 pairs of beavers from D Bar C Ranches, Inc. The total stated price, $52,000, was based upon a value of $3,250 per proven pair and $2,250 per nonproven pair of beaver. The promissory note was for $51,300. Interest *201 was at the rate of 10 percent on the unpaid principal. However, no interest payments were required in any year principal payments were made in beaver. Interest payments were to be made as follows: $5,130 in 1975; $4,955 in 1976; $4,780 in 1977; and $4,605 in 1978. Principal payments were due as follows: On or before December 31, 1975, $700; on or before December 31 of each of the years 1976 through 1978, $1,700; on or before December 31 of each of the years 1979 through 1985, $1,500. After 4 years, petitioner could pay up to $3,500 of principal due for the year in beaver. If payments were made in beaver, the beaver would be valued at $3,500 for proven pairs, $2,400 for nonproven pairs, and $500 for yearling pairs. "Proven," "nonproven," and "yearling" pairs were defined the same as in petitioner Coker's contract. In addition to the 20 pairs of beavers covered by the purchase agreement, petitioner actually received 40 animals with the herd that had been classified as kits before and were classified as yearlings by 1976. The following schedule shows the payments made by petitioner with respect to the purchase and ownership of his beavers: Year
Interest
Principal
Feed
1975
$5,130
$ 700
$2,320
1976
$2,478
None
$2,772
1977
None
None
$2,000
1978
$7,258
$3,500
$2,000
1979
$4,605
$1,750
$1,292
*202 On their Federal income tax returns for the years 1975 through 1979, petitioners claimed the following deductions with respect to the purchase and ownership of their beavers: [5]
Year
Depreciation
Feed
Interest
1975
$9,143
$2,320
$5,130
1976
$9,184
$4,154
$2,478
1977
$7,216
$2,000
None
1978
$5,669
$2,000
$7,258
1979
$2,455
None
$4,605
During 1977 and 1978, petitioner made numerous sales of beavers from his herd to other individuals, which he reported as long-term capital gain on his returns for those years in the amounts of $2,307 and $2,099, respectively. These sales were handled for petitioner by Mr. Crum, and were made on contracts similar to those involved in these consolidated cases. Petitioner instructed Mr. Crum not to sell any of the beavers which were part of the original herd which he purchased in 1975. However, in fact some of the sales included beavers which were part of the original herd as well as beavers which were "death loss replacements" for beavers in the original herd. The animals sold by petitioner *203 in 1977 consisted of beaver 32X68 (a "proven" death replacement received in 1976), beaver 6Y141 (a death replacement received in 1977), 18 original or replacement beavers born in 1974 ("F" beavers), 10 of the 11 beavers born in 1976 which had until the sale been in inventory, and 28 of the 43 kits born in 1977. The animals sold by petitioner in 1978 consisted of beaver 6Y252 (a replacement received in 1976), beaver 6E167 (an "original herd" beaver), 14 original or replacement beavers born in 1974, 20 of the 20 beavers born in 1977 which until the sale had been listed in inventory (one 1977 beaver was listed on the 1979 report as "found alive" and then placed back in inventory), and 15 of 29 kits born in 1978. At the time petitioner entered into the contract and executed the promissory note with respect to the purchase of the beavers, it was petitioner's understanding that the note and liability for the unpaid purchase price was nonrecourse. However, the note, on its face, was recourse. At the time of the trial of this case in January 1983, petitioner had 31 adults and 14 kits in his beaver herd. He was then approximately $5,000 delinquent on his feed bills. After acquiring *204 his beavers in 1975, petitioner became involved with Mr. Crum in the operation of the Snowflake Beaver Ranch in Arizona. Approximately 350 beavers were located on the Snowflake Ranch and the majority of petitioner's herd was kept there. Petitioner was still involved in the ranch operation at the time of trial. Petitioners claimed on their 1975 return $5,200 investment tax credit with respect to their purchased beavers. Petitioners reported no investment tax credit recaptures with respect to beavers for the years 1976 through 1979. The following original herd animals received by petitioner were disposed of on the dates indicated: Disposition
Status as of 12/31/75 as
Year and/or
Brand
Proven or Nonproven
Date
43Y95
Proven
1976
43Y36
Proven
1976
33Y6
Proven
1976
3F243
Nonproven
1976
22F48
Nonproven
1976
5Y202
Proven
1976
33F29
Nonproven
1976
17F40
Nonproven
1976
33F35
Nonproven
1976
1F20
Nonproven
1976
1F68
Nonproven
1976
48Y3
Nonproven
1976
6Y179
Proven
1976
40AC169
Proven
1976
47F215
Nonproven
12-77
22F101
Nonproven
12-77
1F153
Nonproven
12-77
6F16
Nonproven
12-77
6F24
Nonproven
12-77
7F16
Nonproven
12-77
7F6
Nonproven
12-77
33Y54
Proven
By 9-30-77
7F60
Nonproven
By 9-30-77
5Y82
Nonproven
By 4-77
7F56
Nonproven
12-31-77
7F58
Nonproven
By 3-31-77
5Z218
Nonproven
By 3-30-77
47F167
Nonproven
12-31-78
33F102
Nonproven
12-31-78
48F153
Nonproven
12-77
21F27
Nonproven
By 3-30-77
48F150
Nonproven
12-77
22F95
Nonproven
12-77
21Z13
Nonproven
By 6-30-77
22F3
Nonproven
12-77
22F10
Nonproven
By 6-30-77
47F92
Nonproven
12-77
5Y93
Proven
By 6-30-77
13F52
Nonproven
12-77
33F6
Nonproven
12-77
1F109
Nonproven
By 6-30-77
33F42
Nonproven
12-77
47F138
Nonproven
12-31-77
47F90
Nonproven
12-77
3F318
Nonproven
12-31-78
22F122
Nonproven
12-31-78
6F11
Nonproven
12-31-78
6E167
Nonproven
12-31-78
14C164
Nonproven
By 9-30-78
21F12
Nonproven
12-31-78
7F66
Nonproven
12-31-78
21F30
Nonproven
12-31-78
21F32
Nonproven
12-31-78
7F52
Nonproven
12-31-78
7F64
Nonproven
By 6-30-78
2P22
Proven
By 12-15-78
21Y6
Nonproven
By 3-30-78
33F106
Nonproven
12-31-78
6F44
Nonproven
12-31-78
22F97
Nonproven
12-31-78
6F159
Nonproven
12-31-78
6E273
Nonproven
1979
2Z6
Nonproven
1979
5Z36
Nonproven
1979
22X87
Nonproven
1979
22A147
Nonproven
1979
47F55
Nonproven
1979
5Y28
Proven
1979
22F31
Nonproven
1979
*205 Petitioner received no replacement beavers in 1978 or 1979. In 1977 they received 1 proven and 1 nonproven replacement. In his notice of deficiency for the years 1976 through 1979 respondent: (1) disallowed entirely the depreciation claimed on petitioners' returns with respect to the beavers purchased on the ground that petitioners had failed to establish that the beavers existed or that they had an ownership interest in them during the taxable year, or, in the alternative, that petitioners had not established basis in the beavers in excess of $87 per beaver, that the purchase contract was a contract entered into for profit, that the beaver purchase contract had economic substance, or that the purchase contract represented a bona fide debt obligation; (2) disallowed interest expense claimed for all years covered by the notice on the ground that petitioners had not established that the beavers existed, or they had an ownership interest in them, or, in the alternative, that payments of interest were not in fact capital expenditures; (3) determined that investment credit of $5,200 claimed in 1975 should be recaptured in full for 1976; and (4) disallowed the claimed feed expenses *206 for 1976 in excess of $2,772. Petitioners now stipulate to the correctness of the feed adjustment. At trial, respondent conceded that petitioners must recapture investment credit only to the extent of dispositions occurring during the years in issue. In an Amendment to Answer filed on December 17, 1982, respondent asserted that: (1) feed expense deductions claimed for 1976 through 1978 should be disallowed because petitioners had no ownership interest in the beavers, the beaver activities were not entered into for profit, and petitioners did not purchase any beavers or secure feed and care for such animals; (2) petitioners are not entitled to use income averaging for 1976 and 1977 because depreciation, interest, and feed expense deductions claimed on the 1975 return should be disallowed; (3) petitioners are liable for the addition to tax provided by section 6653(a); (4) petitioners are liable for investment tax credit recapture with respect to dispositions of beavers that occurred during the years in issue; and (5) petitioners had ordinary income on the sale of beavers during 1977 and 1978, gain from which was reported as capital gain on petitioners' returns for those years. Respondent *207 requested that the Court determine increased deficiencies resulting from the additional matters raised in the Amendment to Answer. 4. Foy and Katheryn Bryant
Petitioners Foy and Katheryn Bryant were residents of Orangevale, California, at the time their petition was filed. Petitioner Foy Bryant (hereinafter petitioner) has been retired since 1977. Prior to that time and since 1963 he was in the cemetery/mortuary business. In 1975, petitioner was in the process of selling his business and he contacted Michael Sypolt relative to potential investment programs. Mr. Sypolt suggested an investment in beavers, and petitioner obtained a financial projection concerning the investment. After reviewing the projection and further discussing the matter with Mr. Sypolt, petitioner decided to purchase a beaver herd. On December 18, 1975, a Beaver Purchase Contract, security agreement, and promissory note were executed concerning petitioner's purchase from D Bar C Ranches, Inc., of 20 pairs of beavers for a stated price of $52,000. The stated price was based upon a value of $3,250 per proven pair and $2,250 per nonproven pair of beavers. The promissory note was for $51,300, and *208 provided for principal payments as follows: On or before December 31, 1975, $700; on or before December 31 of each of the years 1976 through 1978, $1,750; and on or before December 31 of each of the years 1979 through 1985, $1,500. Beginning in 1980 the principal payments could be made in beaver. If payments were made in beaver, the beaver would be valued at $3,500 per proven pairs, $2,400 for nonproven pairs, and $500 per yearling pairs. These terms were defined in the agreement similar to the definitions included in petitioner Coker's contract. Interest was at the rate of 10 percent of the outstanding principal, but no interest was required in any year principal payments were made in beaver. Petitioner made the following payments with respect to his purchase and ownership of beaver: Year
Interest
Principal
Feed
1975
$ 700
[1]
1976
$1,750
[1]
1977
$4,227
$1,750
$ 1,914
1978
$4,780
$1,750
$11,211
1979
$6,354
$1,750
$ 3,389
1980
$1,500
$ 1,775
1981
$1,500
$ 3,290
1982
$1,500
$ 4,626
*209 On their returns for the years 1976 through 1978, petitioners claimed the following deductions with respect to their purchase and ownership of beavers: [6]
Year
Depreciation
Feed
Interest
1976
$9,184
$ 4,228
$2,478
1977
$7,216
[1] $ 8,097
$4,227
1978
$5,670
$11,216
$4,780
In 1978 petitioner sold 25 pairs of beavers to Alvin R. Wohl, also a petitioner in this case. The terms of the sale are set forth below in the findings pertaining to petitioner Wohl.
During the years 1979 through 1982, petitioner had pelted 24 of his herd. As of September 30, 1982, his herd included 31 adult beavers. Petitioner has been a member of the WBBCA since 1977. The following chart lists the beavers petitioner acquired in 1975, their *210 status as proven or nonproven, and the date of their disposition: Status as Proven
Disposition Year
Brand
or Nonproven
and/or Date
22Z161
Nonproven
22F76
Nonproven
22Z163
Nonproven
By 12-15-78
22F78
Nonproven
22F99
Nonproven
2-15-77
22A150
Nonproven
47A197
Nonproven
1E6
Nonproven
81Z33
Nonproven
81Z76
Nonproven
By 12-15-78
81Z11
Nonproven
81Z26
Nonproven
33Z53
Nonproven
33Z54
Nonproven
3D117
Nonproven
2-20-77
3D308
Nonproven
1E71
Nonproven
1E50
Nonproven
47H91
Proven
By 12-15-78
5Z12
Proven
33AC69
Proven
22A14
Nonproven
11-15-76
33W21
Proven
11-15-76
33W26
Proven
By 12-15-78
43Y77
Proven
43Y2
Proven
43X21
Proven
9-16-77
Status as Proven
Disposition Year
Brand
or Nonproven
and/or Date
43X46
Proven
By 12-15-78
1Z57
Proven
6Z142
Proven
47Z99
Nonproven
47Z10
Nonproven
35H236
Proven
By 12-15-78
17AB58
Proven
22A175
Nonproven
22A122
Nonproven
43Z39
Nonproven
11-15-76
43Z32
Nonproven
47Z109
Nonproven
By 12-15-78
47Z122
Nonproven
In his notice of deficiency for the calendar years 1976 through 1978, respondent: (1) disallowed entirely the depreciation *211 claimed on petitioners' returns with respect to the beavers purchased on the ground that petitioners had failed to establish that the beavers existed or that they had an ownership interest in them during the taxable years, or, in the alternative, that petitioners had failed to establish basis in excess of $75 for proven and $50 for nonproven beavers, that the beaver purchase contract was a contract entered into for profit, that the beaver purchase contract had economic substance, or that the beaver purchase contract represented a bona fide debt obligation; (2) disallowed interest expense deductions claimed for 1976 through 1978 on the ground that petitioners failed to prove the beavers' existence or that they had an ownership interest in the beavers, or, in the alternative, that the amount claimed as interest was not in fact a capital expenditure; (3) determined that petitioners realized additional long-term capital gain and ordinary income from the sale of beavers in 1978 (petitioners do not contest this adjustment); (4) determined that investment tax credit of $5,200 claimed in 1975 should be recaptured in full for 1976. At trial, respondent conceded that petitioners must recapture *212 investment credit only to the extent of dispositions occurring during the years in issue; and (5) determined that petitioners are liable for the addition to tax provided by section 6653(a) for all years in issue. In an Amendment to Answer filed December 17, 1982, respondent asserted that (1) feed expense deductions claimed on petitioners' returns for 1976 through 1978 should be disallowed because petitioners did not have an ownership interest in the beavers, the beaver activities were not entered into for profit, and petitioners did not purchase any beavers or secure feed and care for such animals; and (2) petitioners are liable for investment tax credit recapture for dispositions made during the years in issue. Respondent requested that the Court determine increased deficiencies resulting from the additional matters raised in the Amendment to Answer. 5. Robert D. and Barbara J. Young
Petitioners Robert D. and Barbara J. Young were residents of Modesto, California, at the time their petition was filed. Petitioner Robert D. Young (hereinafter petitioner) graduated from the University of Wisconsin in 1947 with a BS degree in poultry science and agriculture. Thereafter, *213 he served as a farm advisor and teacher for the University of California, and he owned a poultry ranch. In 1963, he went full time into the poultry business, and by the early 1970's he and his partners owned some 22 ranches with over 1 million laying hens, and they employed between 100 and 140 individuals. Petitioner was also involved in an apple business in Washington State and had numerous other investments relating to agriculture or agricultural products. One of petitioner's investments in 1973 or 1974 was an air taxi operation. In connection with that operation he met Dennis Crum and Paul Sharp, who chartered the airplanes from time to time in connection with their travels. After discussions with Mr. Crum and Mr. Sharp, petitioner became interested in investing in beavers and proceeded to investigate the industry. He flew to and visited the ranches then operating near Burley, Idaho; Hamilton, Montana; and Salt Lake City. He inspected the ranches, interviewed the ranch managers, and inspected the ranch recordkeeping operations. He obtained and reviewed a prospectus concerning the purchase of 60 pairs of beavers. On July 16, 1974, a Beaver Purchase Contract, security agreement, *214 and promissory note were executed concerning petitioner's purchase from Dennis Crum, doing business as D Bar C Ranch, of 60 pairs of beavers for the stated price of $177,000. The price was based upon a value of $3,500 per proven pair and $2,400 per nonproven pair of beavers. Principal and interest were payable in cash or, at the option of the purchaser, in beaver. If payments were made in beaver, the beaver were to be valued at $3,500 per proven pair, $2,400 per nonproven pair, and $500 per yearling pair. These terms were defined similar to the definitions in petitioner Coker's contract. The purchase contract acknowledged payment of $24,283 cash, all of which was designated as interest. Principal payments were to be made as follows: $10,850 on or before December 31, 1975; $8,850 on or before December 31, 1976; $4,425 on or before December 31, 1977; $24,000 on or before December 31, 1978, and December 31, 1979; $19,200 on or before December 31, 1980, and December 31, 1981; $24,000 on or before December 31, 1982; $17,800 on or before December 31, 1983; and $22,500 on or before December 31, 1984. Interest payments were to be made as follows: $8,729 on or before December 31, 1974; *215 $15,554 in or before December 31, 1975; $15,486 on or before December 31, 1976; $15,044 on or before December 31, 1977. Interest could be paid up to one year in advance. An addendum to the contract provided that in 1978 petitioner could elect to extend the payment of principal over the next 10 years in equal payments, ending in 1988. Petitioner made the following payments with respect to his purchase and ownership of beavers: Year
Interest
Principal
Feed
1974
$24,283
$ 2,425
$ 5,270
1975
$13,704
1976
$15,486 (in-kind)
$ 19,700 (in-kind)
$15,246
1977
$15,044 (in-kind)
$ 28,425 (in-kind)
$18,534
1978
$ 9,209
1979
$ 24,000 (in-kind)
$ 6,824
1980
$102,500 (in-kind)
$ 3,104
1981
$ 795
Petitioners claimed the following deductions on their returns for 1976 and 1977, relative to the ownership of beavers: Year
Depreciation
Feed
Interest
1976
$23,931
$15,246
$15,486
1977
$21,767
$18,534
$15,044
In connection with the payments in-kind of principal and interest, petitioners reported on their returns for the years of payment long-term capital gains in the amount treated as having been paid. *216 Petitioner was a member and officer of the WBBCA from 1975 through 1980. He was also a shareholder in a beaver ranch operation known as the Reupert Beaver Ranch. In his notice of deficiency to petitioners for the years 1975 through 1977, respondent: (1) disallowed entirely the depreciation deductions claimed on petitioners' 1977 return with respect to the beavers purchased on the ground that petitioners failed to establish that the beavers existed or that they had an ownership interest in them, or, in the alternative, that petitioners had failed to establish basis in the beavers in excess of $150 per proven pair and $100 per nonproven pair of beavers, that the beaver purchase contract was a contract entered into for profit, that the purchase contract had economic substance, or that the contract represented a bona fide debt obligation; (2) disallowed a death loss claimed on the 1977 return (the parties are now in agreement as to the disposition of this issue); and (3) determined that investment tax credit should be recaptured; the parties have now stipulated as to the disposition of this issue as well. In an Amendment to Answer filed on December 17, 1982, respondent asserted *217 that (1) the feed expense deduction claimed for the year 1977 should be disallowed because petitioners did not have an ownership interest in the beavers, the beaver activities were not entered into for profit, and petitioners did not purchase any beavers or secure feed and care for such animals; and (2) petitioners are liable for the addition to tax provided by section 6653(a) for the years 1975 through 1977. Respondent requested that the Court determine increased deficiencies resulting from the additional matters raised in the Amendment to Answer. 6. Emmett L. and Anne R. Moore
Petitioners Emmett L. and Anne R. Moore were residents of Rancho Murieta, California, at the time their petition was filed. Petitioner Emmett L. Moore (hereinafter petitioner) was in the 1970's involved in the securities and investment business. In October 1973, Mr. Crum came to petitioner's offices and described an investment program involving beavers. Mr. Crum presented several prospectuses concerning the purchase and ownership of beavers and showed petitioner and his associates some beaver coats and hats. Thereafter, petitioner visited several of the beaver ranches, talked with ranch managers, *218 and reviewed the beaver ranch recordkeeping systems. On December 28, 1973, petitioner and three of his business associates acting as a partnership under the name of Tama Associates entered into a Beaver Purchase contract, security agreement, and promissory note concerning the purchase of 40 pairs of beavers from D Bar C Ranches, Inc., for a total stated price of $118,000. The stated price was based upon a value of $3,500 per proven pair and $2,400 per nonproven pair of beavers. The contract acknowledged receipt of $12,527 in cash, which was designated as prepaid interest.Principal payments were to be made as follows: On or before December 31 of each of the years 1973 through 1975, $2,360; on or before December 31, 1976, $4,720; on or before December 31 of each of the years 1977 through 1979, $12,000; on or before December 31, 1980, $19,200; on or before December 31, 1981, $16,800; on or before December 31, 1982, $21,600; and on or before December 31, 1983, $12,000. The seller agreed to replace free of charge any adult animals dying before December 31, 1974. Interest was at the rate of 10 percent of the outstanding principal, and was to be made during each of the years 1973 through *219 1975 in the amounts of $12,527, $11,327, and $11,091, respectively. Beginning in 1977, principal could be paid up to $36,000 in beaver. If payments were in beaver, the beaver were to be valued at $3,500 per proven pair, $2,400 per nonproven pair, and $500 per yearling pair. These terms were defined similar to the definitions contained in petitioner Coker's contract. In 1976, Tama Associates dissolved as a partnership, and the beaver purchased by the partnership were then divided equally among the partners. The principal payments called for in the contract and promissory note were made in cash from 1973 through 1975, totaling $7,080. No principal payments were made by petitioner after 1975. After 1974 approximately 23 or 24 beavers kits owned by Tama Associates died due to disease. All of these animals were replaced. It was petitioner's understanding that the replacements were made pursuant to a policy in the industry that if extraordinary circumstances caused the death of animals after their first year of ownership, the animals would be replaced. During 1975, 26 of the beavers purchased in 1973 by Tama Associates were disposed of, including 12 proven and 14 nonproven *220 beavers. Petitioner claimed an investment tax credit for 1973 in the amount of $2,065 with respect to the Tama Associates beaver purchase. On their 1975 return, petitioners claimed interest, feed, and depreciation deductions with respect to their beavers in the amounts of $3,481, $3,900, and $10,315, respectively. No investment tax credit recapture was reported on petitioners' 1975 return. In his notice of deficiency for 1975, respondent: (1) disallowed depreciation of $5,204 [7] on the ground that petitioners failed to establish that the beavers existed or that they had an ownership interest in them, or, in the alternative, that petitioners had failed to establish basis in excess of $150 per proven pair and $100 per nonproven pair of beavers, that the beaver purchase contract was entered into for profit, that the beaver purchase contract had economic substance, or that the beaver purchase contract represented a bona fide debt obligation; (2) determined that investment credit of $2,065 claimed on petitioners' 1973 return should be recaptured for 1975. Respondent conceded at trial that petitioners must recapture investment tax credit for 1975 only to the extent of dispositions *221 occurring during that year; and (3) disallowed interest expense on the ground that petitioners failed to establish the existence or ownership of the beavers, or, in the alternative, that the amount claimed as interest was not in fact a capital expenditure. In an Amendment to Answer filed December 17, 1982, respondent asserted: (1) the feed expense deduction claimed for 1975 in the amount of $3,900 should be disallowed because petitioners did not have an ownership interest in the beavers, the beaver activities during the year were not entered into for profit, and petitioners did not purchase any beavers or secure feed and care for such animals; and (2) petitioners are liable for investment tax credit recapture by reason of beaver dispositions. Respondent requested that the Court determine an increased deficiency resulting from the additional matters raised in the Amendment to Answer. 7 Alvin R. and Donna Wohl
Petitioners Alvin R. and Donna Wohl were residents of Sacramento, California, at the time *222 their petition was filed. Petitioner Alvin R. Wohl (hereinafter petitioner) is and has been at all times material to this case an attorney practicing in Sacramento, California. In 1978, petitioner was contacted by Mr. Crum relative to an investment in beavers. Petitioner was provided with a prospectus and information concerning domestic beaver ranching. He discussed the information with Mr. Crum and an associate in his law office (now petitioner's counsel in this case) who had some knowledge concerning the industry and the tax aspects involved. On November 1, 1978, a Beaver Purchase Contract, security agreement, and promissory note were executed concerning petitioner's purchase of 25 pairs of beavers from Mac Roundy and Foy Bryant for the stated price of $68,800. Interest was payable in cash quarterly at the rate of 8 percent of the outstanding principal balance through 1980, and 6 percent thereafter. An initial cash payment was designated as $857 interest and $4,500 principal. Principal payments were to be made as follows: On or before December 31, 1978, $4,500; on or before December 31, 1981, $2,400; on or before December 31, 1982, $4,400; on or before December 31, 1983, $8,400; *223 on or before December 31, 1984, $11,100; and on or before December 31 of each of the years 1985 through 1989, $9,500. After 1981, the principal payments could be paid in beaver. Payments made in beaver were to be valued at $3,500 per proven pair, $2,400 per nonproven pair, and $500 per yearling pair. These terms were defined similar to the definitions in petitioner Coker's contract. Petitioner made the following payments with respect to his purchase and ownership of beavers: Year
Interest
Principal
Feed
1978
$ 857
$4,500
1979
$5,144
$ 6,258
1980
$5,144
$ 6,220
1981
$3,714
$11,103
1982
$2,588
$2,400 (in-kind)
$ 9,760
1983
$4,400 (in-kind)
On their Federal income tax returns for the years 1978 through 1980, petitioners claimed the following deductions with respect to their ownership of beavers: Year
Depreciation
Feed
Interest
1978
$10,966
$ 857
1979
$16,524
$6,258
$5,144
1980
$11,803
$6,220
$5,144
With his purchase of 25 pairs of adult beavers, petitioner received from the sellers 20 kits as well. Petitioner did not report any investment tax credit recapture relative to beavers on his *224 1979 or 1980 returns. With respect to the original proven, nonproven, and kits received (with kit, proven, and nonproven status measured as of November 1, 1978) by petitioner in connection with his beaver purchase contract, the following occurred: (a) during the first quarter of 1979, 4 kits, 3 provens, and 1 nonproven died; 2 provens and 2 nonprovens were received as replacements; (b) during the second quarter of 1979, 2 kits and 2 nonprovens died; 1 proven and 1 nonproven were received as replacements; (c) during the third quarter of 1979, 2 nonprovens and 1 proven died; 2 nonprovens, 1 proven, and 5 kits (1978-born beavers) were received as replacements; (d) during the fourth quarter of 1979, 1 proven and 1 kit died; (3) during the first quarter of 1980, 6 kits (1978-born beavers) were pelted, 5 nonprovens were pelted, 1 nonproven replacement was pelted, 1 proven replacement was pelted, and 1 nonproven died; (f) during the second quarter of 1980, 1 kit, 1 proven, and 1 nonproven died; (g) during the third quarter of 1980, 2 kits died; and (h) during the fourth quarter of 1980, 2 kits, 2 nonprovens, and 1 nonproven replacement died. In his notice of deficiency to petitioners *225 for the years 1978 through 1980, respondent (1) disallowed entirely depreciation claimed for the years 1978, 1979, and 1980 on the ground that petitioners had failed to establish the existence or ownership of the beavers, or, in the alternative, that petitioners had failed to establish basis in the beavers in excess of $4,500, that the beaver purchase contract was a contract entered into for profit, that the beaver purchase contract had economic substance, or that the beaver purchase contract represented a bona fide debt; (2) determined that investment credit claimed by petitioners for 1978 in the amount of $6,880 should be disallowed because petitioners failed to establish the existence of, or ownership in the beavers, or, in the alternative, that their basis was in excess of $4,500; and (3) disallowed interest expense deductions claimed for 1978, 1979, and 1980, on the ground that petitioners failed to establish the existence or ownership of the beavers, or, in the alternative, that the amounts claimed as interest did not in fact represent capital expenditures. In an Amendment to Answer filed on June 1, 1982, respondent asserted: (1) neither investment tax credit nor depreciation *226 is allowable because the beavers were not purchased as part of an activity entered into for profit, and the purchase did not have substance and was made solely to avoid taxes; (2) feed expense deductions claimed for 1979 and 1980 should be disallowed because petitioners did not have an ownership interest in the beavers, did not have a profit objective in purchasing the beavers, and/or did not purchase and secure feed and care for beavers but purchased a package of tax benefits; and (3) petitioners are liable for the addition to tax provided by section 6653(a) for all the years involved. Respondent requested that the Court determine increased deficiencies resulting from the additional matters raised in the Amendment to Answer. 8. Douglas G. and Betty J. Webber
Petitioners Douglas G. and Betty J. Webber were residents of Del Mar. California, at the time their petition was filed. Petitioner Douglas G. Webber (hereinafter petitoner) has for 12 years been the president of Questron Corporation, which is engaged in the high technology electronics business. Petitioner became aware of the potential to invest in beavers in 1976 through a friend, Richard Cash, who owned a beaver *227 herd at the time. Petitioner obtained a prospectus and background information on the beaver industry from Mr. Crum, and discussed the materials with Mr. Cash. In 1977, he decided to invest in a herd himself. In December 1977, a Beaver Purchase Contract, security agreement, and promissory note were executed concerning petitioner's purchase of 40 pairs of beavers for a stated purchase price of $109,200. The price was based upon values of $3,500 per proven pair, and $2,400 per nonproven pair of beaver. Interest was due on the unpaid principal at the rate of 10 percent for 1977; 8 percent for 1978; and 6 percent thereafter. All interest payments were to be in cash. An initial cash payment was designated as $833 interest and $9,200 principal. This payment was made by check on December 27, 1977. Principal payments were to be made as follows: On or before December 31, 1977, $9,200; on or before December 31, 1980, $4,800; on or before December 31, 1981, $9,600; on or before December 31, 1982, $19,200; on or before December 31 of each of the years 1983 through 1987, $12,000; and on or before December 31, 1988, $6,400. Beginning after 1980, principal payments could be made in beaver. *228 Payments in beaver were to be valued at $3,500 per proven pair, $2,400 per nonproven pair, and $500 per yearling pair. The terms were defined as they were in petitioner Coker's contract. With his purchase of 40 pairs of adult beavers, petitioner received from the seller 30 kits born in 1977 as well. Petitioner made the following payments with respect to his purchase and ownership of beavers: Year
Interest
Principal
Feed
1977
$ 833
$9,200
1978
$6,000
$ 7,585
1979
$6,000
$10,278
1980
$6,000
$ 8,077
1981
$5,136
$4,800 (in-kind)
$ 5,802
1982
$1,006
$9,600 (in-kind)
$ 1,456
Petitioner claimed the following deductions on his returns for the years 1977 through 1979 with respect to his purchase and ownership of beavers: [8]
Year
Depreciation
Feed
Interest
1977
$ 5,095.83
$ 1,120
$ 833
1978
$26,026.00
$ 7,586
$8,000
1979
$19,520.00
$10,280
$8,000
Petitioners reported no investment tax credit recapture relative to beavers on their returns for 1977, 1978, or 1979. During 1978, 8 of petitioner's *229 purchased beavers died. During 1979, 20 of the purchased beavers died and 19 were sold or otherwise disposed of. A 1979 installment sale by petitioner of beaver included 30 beavers born to petitioner's herd during 1978, and one beaver born during 1979. In his notice of deficiency for 1977, 1978, and 1979, respondent: (1) disallowed losses shown on petitioner's returns from their beaver breeding operation on the ground that petitioners had not established that the transactions regarding beaver breeding were bona fide, arm's-length transactions at fair market value, or were entered into for profit, or had economic substance, or that expenses had been incurred or were ordinary and necessary business expenses; (2) disallowed the portion of the losses attributable to depreciation on the ground that petitioners failed to establish a proper cost basis, method, or useful life for depreciation purposes; (3) disallowed the portion of the losses attributable to interest on the ground that petitioners failed to establish a bona fide debtor-creditor relationship existed, or, if such a relationship existed, that the interest was incurred and expended; (4) disallowed the portion of the losses *230 attributable to feed expenses on the ground that petitioners failed to establish that the expenses were incurred, or were ordinary and necessary business expenses; and (5) disallowed investment credit claimed on petitioners' 1977 and 1978 returns with respect to their beaver purchase on the ground that petitioners failed to establish that the beaver purchase transaction qualifies for investment tax credit under sections 38 and 48, and that the purchase transaction had no economic substance. In an Amendment to Answer filed December 17, 1982, respondent asserted: (1) no beavers were purchased in 1977 and the earliest that petitioners would be entitled to investment credit and depreciation in any event would be 1978; (2) petitioners are liable for recapture of depreciation with respect to beaver reported as sold on their 1979 return; (3) petitioners are liable for investment tax credit recapture for beavers with were disposed of during 1978 and 1979; (4) yearling beavers sold by petitioner in 1979 are not section 1231 assets and therefore do not qualify for long-term capital gains treatment; and (5) petitioners are liable for the addition to tax provided by section 6653(a) for 1977, *231 1978, and 1979 due to negligence or intentional disregard of the rules and regulations. Respondent requested that the Court determine increased deficiencies due to the matters raised in his amendment. OPINION I. Existence and Ownership of Beavers
The deficiency notices and Amendments to Answer in these cases assert that petitioners failed to prove the existence of, or an ownership in, the beavers with respect to which deductions and tax credits were claimed. On brief, respondent "concedes that the beavers petitioners' claimed to have owned did exist during the years in issue." While respondent does not specifically concede the matter, he makes no argument on brief that petitioners did not own the beavers they claimed to have purchased, although he argues generally that the purchases were "shams." The evidence proves to our satisfaction that the beavers did indeed exist and that the benefits and burdens of ownership were in fact transferred to and assumed by the petitioners in connection with their purchase transactions. [9] Accordingly, we proceed to examine the other grounds raised by respondent in support of his disallowances. [10]
*232 II. Use of the Stated Contract Prices or Fair Market Value in Determining Investment Tax Credit, Depreciation, and Interest
(a) The significance of value. Both sides to this controversy agree that one of the issues to be resolved by the Court involves the valuation of beavers, but we believe it is important at the outset of this opinion to analyze the significance of that issue. Each of these consolidated cases involves respondent's disallowance of depreciation deductions claimed with respect to the beavers purchased by petitioners and some cases involve the disallowance of claimed investment tax credits as well. [11] Both depreciation and investment tax credit are calculated by reference to basis. Secs. 38, 46(c)(1)(A), and 167(g). Generally, the tax basis of an asset is the same as its cost. Secs. 1011 and 1012. However, there are several recognized exceptions to the general rule which have particular applicability to this case. First, in cases involving the acquisition of property where part of the stated consideration is nonrecourse indebtedness, basis has been limited by excluding from it the amount of the nonrecourse indebtedness where the purchase price unreasonably *233 exceeds the value of the underlying property (or the principal amount of the purported indebtedness unreasonably exceeds the value of the property). In these situations, the purchaser is considered to have no actual investment in the property to the extent of the portion of the artificially inflated price represented by the purported indebtedness. See Fox v. Commissioner,80 T.C. 972, 1019-1020 (1983); Brannen v. Commissioner,78 T.C. 471, 493 (1982), on appeal (11th Cir., Aug. 23, 1982); Siegel v. Commissioner,78 T.C. 659, 684-685 (1982); Hager v. Commissioner,76 T.C. 759, 784 (1981); Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). [12] The rule has been applied to disallow not only depreciation and investment tax credit based upon the inflated price, but deductions for interest claimed to have been paid with respect to the nonrecourse indebtedness as well. See Flowers v. Commissioner80 T.C. 914 (1983); Siegel v. Commissioner,supra.
*234 We think these cases involving nonrecourse indebtedness and inflated property values have general applicability to the issues involved in the consolidated cases before us in that the prior cases serve as precedent for the Court's disregarding, for tax purposes, a portion of an asset's stated cost where the stated cost is not supported by a realistic valuation of the asset.Respondent would have us go further and conclude that the cases involving nonrecourse indebtedness are directly applicable here because, respondent argues, petitioners' notes given in payment for their beavers should be considered nonrecourse. Respondent apparently recognizes the fact that none of the notes or other documents executed in connection with petitioners' purchase transactions purport to limit or exclude the petitioners' personal liability for the full amount of the stated contract prices. However, respondent relies upon the fact that one of the eight petitioners (Sypolt) testified that he thought his note was nonrecourse, although the written terms of his contract and note are no different in any material respect from those of the other petitioners. Respondent places principal reliance upon the fact *235 that most of the stated purchase price and indebtedness could be paid in-kind with beavers instead of cash, as well as the fact that death loss replacements were guaranteed during the first year of the contract and were customarily made thereafter. Respondent argues that these circumstances, together with evidence that some contracts (not involving petitioners in these cases) were voluntarily rescinded and others were not enforced by the sellers when the buyers defaulted, justify our considering the notes, in substance, as nonrecourse. Petitioners of course disagree, and rely upon the written terms of the notes and contracts and their own testimony (except for Sypolt) that they considered themselves to be personally liable for the full amount of the purchase price. They argue that although a portion of the price could, at their option, be paid in-kind, they nevertheless had an obligation to either come up with cash payments or deliver beavers at the time principal payments were due, and their failure to do so would subject them to personal liability. We conclude that it is unnecessary for us to resolve this question, because the portion of the contract price that is found to be *236 unreasonably inflated in relation to the purchased beavers' fair market value should be disregarded for tax purposes even if the purchasers are considered personally liable for the entire purchase price. Our recent opinion in Lemmen v. Commissioner,77 T.C. 1326 (1981), is partcularly applicable in this regard. There, petitioner purchased 2 herds of cattle for stated prices of $40,000 and $20,000. At the time of the purchases, the fair market value of the cattle was $7,000 per herd. In the case of the $40,000 purchase, the petitioner paid $7,500 cash down and executed a $32,500 negotiable promissory note for which he was personally liable. The second herd was purchased for $20,000 cash. In connection with each purchase, the seller agreed to maintain and care for the cattle in exchange for some of the calves produced during the term of the contract. Respondent disallowed depreciation claimed by petitioner and as one reason for the disallowance asserted that the alleged purchase prices of the cattle were in excess of the cattle's fair market value. We held in part as follows: As a general rule, the basis of property for tax purposes will be its cost (sec. 1012) *237 and, in a money-for-property transaction, cost is equal to the price paid for the property. Edwards v. Commissioner,19 T.C. 275, 279 (1952). However, as we have stated before, this rule-- does not apply where a transaction is not conducted at arm's-length by two economically self-interested parties or where a transaction is based upon "peculiar circumstances" which influence the purchaser to agree to a price in excess of the property's fair market value. Bixby v. Commissioner,58 T.C. 757, 776 (1972). See Jordan v. Commissioner,60 T.C. 872, 879-881 (1973), affd. per curiam 514 F.2d 1209 (8th Cir. 1975). In such cases, the basis of property for tax purposes may be limited to its fair market value. See e.g., Mountain Wholesale Co. v. Commissioner,17 T.C. 870, 875 (1951); G.U.R. Co. v. Commissioner,41 B.T.A. 223 (1940), affd. 117 F.2d 187 (7th Cir. 1941). * * * Clearly, however, in purchasing a "package" comprising cattle and a maintenance contract, petitioner had an obvious incentive to agree to an inflated purchase price for the cattle (at the expense of what *238 might otherwise be treated as prepaid maintenance) so as to increase the investment credit and deductions for accelerated depreciation to which he would be entitled. At the same time, [the seller] in offering "managed breeding herds" had an incentive to include disguised future maintenance fees in the sales price of the cattle. By so doing, [the seller] could confer the above tax benefits on its investors at little or no cost to itself, thus sweetening the investment for the high-bracket taxpayers for whom the breeding program was designed. In these cpeculiar circumstances" ( Bixby v. Commissioner,supra), we find that petitioner's cost basis in his cattle must be limited to their fair market value, i.e., $7,000 per herd. * * * [Lemmen v. Commissoner,supra at 1347-1349.] [13]
*239 There are clearly peculiar circumstances involved in the petitioners' beaver purchases that likewise warrant basis being limited to the beavers' fair market value. Central to this conclusion is our finding that the fair market value of the beavers was substantially less than the values utilized in arriving at the stated purchase prices. We have found as a fact, and discuss that finding below, that the fair market values of beavers during the periods relevant to these cases are no more than $200, $137, and $29 for proven, nonproven, and yearling beavers, respectively. The question to be addressed is why were petitioners and many other purchasers willing to agree to contract prices of $1,750 and $1,200 for proven and nonproven beavers (or, as stated in pair values, $3,500 for proven and $2,400 for nonproven). We think the answer lies with the peculiar provisions of the purchase contracts and related promissory notes permitting payment of a substantial portion of the purchse price by delivering beavers to the seller rather than paying cash, together with the perceived tax benefits of utilizing these provisions to exaggerate the price. To the extent the stated purchase price could *240 be paid with beavers and delivery of beavers in lieu of cash payments would cause the principal of the indebtedness reflecting the price to be reduced based upon stated values of the beavers identical to the values upon which the purchase price was calculated in the first place, the purchasers had little incentive to negotiate at arm's-length and attempt to minimize the price. This was especially the case in view of the fact that the herd only had to maintain its original size in order for the purchaser to avoid monetary liability for the in-kind portion of the contracts and notes. Based upon the projections supplied to the purchasers and the information concerning the expected reproduction rates, the purchasers had every reason to believe that they indeed would have an ample supply of beaver with which to make their in-kind payments. Of course, the death replacement guarantee and actual practice served to make that expectation even more secure. Moreover, there was every incentive for the purchaser to readily agree to the stated prices, irrespective of the extent to which they were inflated in monetary terms, given the substantial tax benefits illustrated by the sellers as being *241 derived from investment credits and depreciation based upon the designated prices.As to the sellers' motivation, we can only conclude their desire to sweeten the attraction of investments in beavers with substantial tax savings flowing to the purchasers caused them to deliberately inflate the prices and overstate the beavers' value. See Lemmen v. Commissioner,supra at 1349. In this respect, most of the sales were made by or through Paul Sharp and Dennis Crum. Our findings set forth many transactions where these individuals purchased beavers for less than $200 and generally the same beavers were resold at stated values of $1,200 and $1,750. Mr. Sharp and Mr. Crum were obviously in a situation where they knew the true cash values of the beavers, and, when they were purchasing with a view toward resale, had no motivation with respect to the price other than to minimize it. On the other hand, their purchasers were acquiring the beavers with a view towards maintenance of their herd for a number of years during which they were presented with the prospect of realizing substantial tax benefits, yet their monetary liability was limited to a large extent by the in-kind *242 payment provisions. While the prospectuses presented to the purchasers uniformly showed little or no income from the maintenance of the herd during the first 5 years of ownership, they showed thousands of dollars of tax savings during the same period derived principally from credits and deductions based upon the inflated prices. We have considered the testimony and argument of all the petitioners in these cases to the effect that they had no knowledge of the prices which their sellers had paid for the beavers petitioners agreed to purchase at the stated values. Assuming that was the case, it does not serve to permit petitioners to claim deductions based upon purchase prices that are in fact inflated. A similar argument was made by the petitioners involved in Estate of Franklin,supra, and was rejected by the Court of Appeals for the Ninth Circuit where it stated at p. 1048, n. 4: Petitioners spent a substantial amount of time at trial attempting to establish that, whatever the actual market value of the property, [the purchaser] acted in the good faith belief that the market value of the property approximated the selling price. However, this evidence *243 only goes to the issue of sham and does not supply substance to this transaction. "Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of the individual taxpayers." Lynch v. Commissioner,273 F.2d 867, 872 (2d Cir. 1959). See also Bornstein v. Commissioner,334 F.2d 779 (1st Cir. 1964); MacRae v. Commissioner,294 F.2d 56 (9th Cir. 1961). For similar reasons, we must also reject the argument of petitioner Bryant that his situation is different because he in fact made principal payments in cash even after he had the option of making them with beavers under the terms of his contract and note. Whatever motivated petitioner Bryant to do so does not negate the fact that the purchase prices he agreed to were significantly in excess of the beavers' fair market value. At the time of purchase, Mr. Bryant was supplied with a prospectus similar to that shown to the other petitioners and was advised by Mr. Sypolt (also a petitioner in these cases) who had invested in beavers himself, had recommended the investment to others, *244 and was well aware of the tax savings represented by the sellers. For these reasons, we think that even petitioner Bryant's purchase involved peculiar circumstances which warrant limiting basis to fair market value, and that his purchase should not be viewed as simply a "bad bargain." See Estate of Franklin v. Commissioner,supra at 1046. We do not mean to imply by our holding in the cases before us that basis may not reflect both the time value of money and the normal tax benefits inuring to a purchaser. Certainly the ultimate price paid in many transactions legitimately reflects both these factors. But these cases involve unique and peculiar circumstances which caused both the price and the anticipated tax benefits associated with it to be greatly exaggerated. In these circumstances, we think the actual tax benefits of purchase and ownership should be based upon realistic values assigned to the property involved. (b) Interest Deductions. Petitioners made cash payments pursuant to their purchase contracts which were designated as interest and they simply rely upon the form of their purchase contracts and notes in support of their claimed deductions *245 for these payments. But the form of the purchase contracts and related payment obligations involved in these transactions clearly does not comport with reality to the extent the values assigned to the beavers are inflated substantially in excess of fair market value for purposes of both the price and the amount of the purchase obligation reduced by payments in-kind. It has long been held that the substance, not the form, of transactions controls for tax purposes. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Foster v. Commissioner,80 T.C. 34, 201 (1983). The purported interest obligations are, to the extent of the inflated values, without substance. "Interest" deductible under section 163 has long been defined as "a charge for the use or forbearance of money." Deputy v. du Pont,308 U.S. 488, 498 (1940); Norton v. Commissioner,474 F.2d 608, 610 (9th Cir. 1973). Interest payments made with respect to an installment sale of property are, for purposes of section 163, subject to this same basic definitional requirement as is interest paid with respect to a cash loan. Beek v. Commissioner,80 T.C. 1024 (1983). *246 Applying the tax law definition of interest, the Ninth Circuit Court of Appeals held in Estate of Franklin,supra, that a $75,000 payment claimed to have been made as prepaid interest in connection with the purchase of property where the stated purchase price was secured by a nonrecourse note substantially in excess of the property's fair market value is not deductible under section 163 and stated: * * * Under these circumstances the purchaser has not secured "the use or forbearance of money".* * * Nor has the seller advanced money or forborne its use. * * * Prior to the date at which the balloon payment on the purchase price is required, and assuming no substantial increase in the fair market value of the property, the absence of personal liability on the debt reduces the transaction in economic terms to a mere chance that a genuine debt obligation may arise. This is not enough to justify an interest deduction. To justify the deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for *247 him to make a capital investment in the amount of the unpaid purchase price. * * * [The purchaser] during the taxable years in question, confronted no such situation. Compare Crane v. Commissioner,331 U.S. 1, 11-12, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). [Estate of Franklin v. Commissioner,544 F.2d 1049 (9th Cir. 1976).] Numerous cases decided subsequent to Estate of Franklin have likewise concluded that where the purchase price and the principal amount of the nonrecourse indebtedness which makes up a portion of the price unreasonably exceeds the value of the property involved, no "genuine indebtedness" exists, no "investment in the property" occurs, and therefore interest on the note is not deductible. See Flowers v. Commissioner,supra, Slip Opinion at 44, and cases cited thereat. As previously stated, we are not deciding in these cases that the notes involved should be treated as nonrecourse. But we believe that even if the notes are viewed as giving rise to personal liability of petitioners, the full amount of the payments designated as interest is not deductible as such under section 163 because the payments *248 do not represent, in substance, "charges for the use or forbearance of money," nor has the seller "advanced money or forborne its use" to the full extent of the stated indebtedness. The excess of the amount of the indebtedness over the value of the property which could be delivered to the seller to satisfy it is no more real than in those cases involving nonrecourse notes and inflated property values.[14]
*249 In this respect, the stated indebtedness was, to the extent it could be paid in beavers with real values substantially less than the values designated in the contract and note, clearly without substance. The seller agreed to transfer to the purchaser property worth nowhere near the stated values upon which the price was based, and he agreed to take as payment therefor property which likewise was assigned the same inflated values. The purchaser had the option of either paying in cash at the inflated values, or delivering beavers worth the same as, or less than, those being purchased. Indeed, while the contracts and notes provided that beavers could be used in payment, they made no specification whatsoever as to the quality or condition of beavers which would be acceptable to satisfy the purchasers' liability. In these circumstances, we think interest can be viewed as having been paid only to the extent it is based upon realistic monetary values as regards the purchaser's obligation to pay and to the seller's extension of credit. The record establishes that the interest rates stated in the contracts and notes were reasonable in relation to the market interest rates at the time. *250 Accordingly, we conclude that the amount deductible as interest is limited to the lesser of (1) the amounts actually paid as interest or (2) an amount determined by applying the stated contract interest rates against the cash principal portion of the contracts and notes (if any), plus the fair market value of beavers, as we have found them, to the extent that beavers could be utilized in payment of the stated amounts. We emphasize that our holding as to the amount on which the calculation of interest is predicated rests on our conclusion that a bona fide indebtedness existed to the extent of that amount and that there was a bona fide objective of making a profit aside from the tax benefits which the petitioners expected to obtain. See pp. 90-103, infra. Compare Goldstein v. Commissioner,364 F.2d 734, 738-742 (2d Cir. 1966), affg. 44 T.C. 284 (1965). [15] Amounts paid and allowed as interest deductions for years prior to those before the Court should be taken into account in determining the extent to which interest paid during the periods in issue is deductible as such. [16] Cf. Hillsboro National Bank v. Commissioner, 460 U.S.     (Mar. 7, 1983). *251 *252 (c) The substance of the purchase transactions. We recognize that our conclusions that petitioners are entitled to basis in an amount no greater than fair market value and are not entitled to interest deductions with respect to the stated amounts of the in-kind portion of the indebtedness result in petitioners having paid out-of-pocket amounts designated as principal and interest for which they receive no tax benefit. However, we think this reflects the realities of petitioners' transactions. Unlike the circumstances involved in Lemmen where part of the inflated price for cattle was found attributable to maintenance contracts, petitioners here did not enter into agreements concerning the maintenance of their herds as a part of the purchase transactions. Rather, they made their own arrangements with the ranch owners and operators to pay, insofar as the record reflects, arm's-length charges, separate and apart from the purchase prices, for feed and care of the animals on an ongoing basis. Indeed, petitioners take an "all or nothing approach" to deductibility and simply argue that they are entitled to depreciation and interest deductions in relation to the stated terms of *253 the purchse contracts and notes. [17] Nevertheless, while we conclude that petitioners' reliance solely upon the form of the transactions is without merit, we likewise conclude that petitioners did in fact pay some value for animals and they acquired ownership of those animals. The situation here is somewhat like that involved in Houchins v. Commissioner,79 T.C. 570, 604 (1982), where we concluded that petitioners' investment in a cattle breeding program involving a purported sale of cattle for prices substantially in excess of fair market value in substance amounted to petitioners' acquisition of an option to purchase the cattle, even though it involved the *254 purchase of fabricated tax benefits as well. Thus, in spite of the artificial nature of the form of the transactions involved in the program and the exaggerated tax benefits, we found that petitioners attached some economic value to their investment and therefore the entire transaction should not be characterized as a sham to be wholly disregarded for tax purposes. Likewise, we conclude that the beaver purchase contracts involved here inflated the prices that petitioners agreed to pay with a view toward realizing substantial tax benefits based upon those inflated prices. To this extent, petitioners agreed to pay for tax benefits. But there was more to the transactions. Unlike petitioners in Houchins, petitioners here obtained not only record title to the animals, but they obtained the benefits and burdens of ownership as well. See Merrill v. Commissioner,40 T.C. 66 (1963), affd. 336 F.2d 771 (9th Cir. 1964). In this regard, petitioners received detailed computer records accounting for their animals at the time of purchase, and they received (quarterly) similar records throughout their period of ownership. They were responsible for feeding *255 and caring for the animals and they in fact assumed those responsibilities. As record owners of the beavers petitioners made the decision as to whether and when to pelt; indeed, these decisions were sometimes contrary to the views and recommendations of the ranch operators. To the extent that proceeds were received by the marketing organization from the sale of animals or their products, the proceeds were accounted for to the petitioners as owners. Some petitioners sold portions of their herds, and they received the proceeds of sale (and reported the sales on their tax returns). We have considered the evidence concerning death loss replacements but conclude that neither the seller's guarantee to make replacements of animals dying during the first year following purchase nor the practice to replace dead animals thereafter negates the substance of petitioners' ownership of the animals. Certainly the guarantee to replace any animals dying during the first year is not inconsistent with a sale. Further, to the extent replacements were made thereafter, the record is unclear as to the extent to which the replacements were made by petitioners' seller, or by the ranch operators being *256 paid to feed and maintain the herds. In any event, the record supports a conclusion that, at most, there was a practice to replace animals where extraordinary weather conditions or disease caused significant losses. These circumstances do not in our view make the petitioners' ownership a sham for tax purposes. Likewise, we cannot accept respondent's argument that evidence concerning voluntary recisions of beaver purchase contracts proves that petitioners' purchases were shams. The petitioners' contracts were, for the most part, performed by the parties. Some of the petitioners involved in these cases made substantial cash payments on their contracts and all made substantial cash payments for feed and care after the beavers were acquired. Many individuals in the mid-1970's entered into purchase contracts similar to those executed by petitioners, and there is evidence concerning recision of relatively few. The fact that sellers sometimes failed to pursue their remedies against purchsers by bringing suit and instead took back the animals involved does not, in our view, disprove petitioners' claim that by virtue of their contracts they acquired the normal benefits and burdens of *257 ownership. In short, we agree with respondent that part of what petitioners purchased was the expectation of unrealistic tax benefits. But we think they purchased beavers as well, and are entitled to the tax benefits of ownership to the extent of the realistic values and obligations involved in their purchase transactions. (d) The fair market value of beavers. On the valuation issue, petitioners submitted expert testimony from three individuals: Robert E. Frost, Paul Sharp, and Dennis Crum. Respondent submitted testimony from two experts: Moris Soudack and Dr. Edward Hill. While we found all of these individuals qualified in their fields of expertise, unfortunately none of their opinions are of much benefit to us in resolving the question as to the fair market value of beavers. We will discuss each expert's valuation conclusions in some detail, but there is a fundamental weakness in the approach taken by all three of petitioners' experts, as well as by petitioners themselves, which should be recognized at the beginning of this discussion. Petitioners and their experts simply disregard the cash transactions involving beaver acquisitions, almost all of which were stipulated *258 and are set forth in our findings above. Many of the transactions involve purchases by Paul Sharp and Dennis Crum from ranchers for cash prices ranging from approximately $50 to $250 where the same beavers were resold on contracts at stated prices of $2,400 and $3,500 per pair. None of the experts in their reports nor their direct testimony even recognized the existence of these transactions, let alone provided any adequate reconciliation of their value opinions with these actual cash transactions. Near the conclusion of the trial, Mr. Crum attempted to justify his and petitioners' total disregard of these cash transactions with general testimony to the effect that the cash transactions involved situations where prior owners had failed to pay their feed bills, and the ranchers foreclosed on the animals and resold them for cash, or where Mr. Crum entered into recision agreements with contract purchasers or the contract purchasers defaulted on wheir obligations and the seller took the animals back.This testimony simply fails to adequately justify the disregard of the cash transactions entirely for purposes of determining value. First, the majority of the transactions, based upon *259 the stipulation of facts, do not involve recisions or contract defaults, but, insofar as the stipulation reflects, are outright cash purchases. Many of the sales were made by individuals identified in the record as ranchers. Moreover, we fail to see how the fact that ranchers acquired animals as a result of owners' failure to pay their feed bills serves to justify disregarding as evidence of value the ranchers' sale of the animals for cash. The fact remains that the animals were sold in transactions that have not been shown to be anything other than arm's-length. It strains the imagination to conclude that the ranchers repeatedly sold their animals for $200 or less at the same time their animals had a fair market value of $1,200 or $1,750. The failure of petitioners and their experts to take into account the cash transactions is especially significant in view of the large number of transactions occurring over the same time period that petitioners entered into their contracts. Thus we cannot fairly conclude, on the basis of this record, that the cash transactions, considered as a whole, involved unusual or extraordinary circumstances so that they should not be afforded considerable *260 weight in determining fair market value. Fair market value has been defined as the price which would be arrived at between a willing buyer and a willing seller, neither party acting under compulsion, both parties being fully informed as to all relevant facts, and both buyer and seller having adverse economic interests. Narver v. Commissioner,75 T.C. 53 (1980), affd. 670 F.2d 855 (9th Cir. 1982). In Narver, a corporation purchased real property for $650,000 and immediately resold the building for a purported price of $1,800,000 to two limited partnerships. We stated (75 T.C. at 96): "Surely an increase in value of more than 600 percent in a single day strains reasonable credulity. Thompson v. Commissioner,66 T.C. 1024, 1051 (1976)." Likewise, in Hager v. Commissioner,76 T.C. 759, 784 (1981), petitioner's partnership purchased cattle from a related entity for an average stated price of $15,000 per animal and we concluded that in view of the evidence concerning actual cash transactions in cattle at prices of $3,000 or less per animal the "dramatic price increase" purportedly paid by the partnership *261 was "suspect." See 76 T.C. at 779. We rejected the appraisal made by petitioner's expert largely because it either disregarded or failed to adequately account for the prior arm's-length transactions. Again in Brannen v. Commissioner,78 T.C. 471, 493 (1982), on appeal (11th Cir., Aug. 23, 1982), we held that petitioner's partnership was not entitled to basis in the amount of the stated purchase price where a movie was purchased for $330,000 cash and a $1,400,000 nonrecourse note because the fair market value of the movie was not anywhere near the stated purchase price and stated (at 497): "An important factor in our determination of an approximate value of the movie is the cash price paid in the two prior sales of the movie." Petitioners' expert Mr. Frost not only failed to take into account the cash transactions in beavers, including those where Mr. Crum and Mr. Sharp purchased beavers for resale at the stated contract prices, but he failed to provide much more than the bare conclusion that the beavers were worth the amounts stated in the contracts. We accept Mr. Frost's considerable experience in the fur industry in general, and in the beaver market *262 in particular, and we find that, after being retained as an expert by petitioners in connection with these cases, he made a thorough investigation of all aspects of domestic deaver ranching. But that background, experience, and investigation does not itself establish the credibility of Mr. Frost's valuation conclusions, especially where those conclusions are unsupported by objective transaction evidence. Mr. Frost attempted to support his valuations with a schedule he prepared showing estimated revenue, expenses, and tax savings involved in the purchase and maintenance of a herd comprised of 25 pairs of beaver in 1982. Aside from the fact that the projection covers the years 1982 through 1993 and involves assumptions concerning herd growth, expenses, and pelt sales prices based upon Mr. Frost's 1982 estimates, while the valuation issue in these cases involves a time frame in the mid-1970's, Mr. Frost's projection on its face does not provide any basis for his valuation conclusions. Rather, the projection simply assumes that the beavers being purchased are purchased for prices of $3,500 and $2,400 per pair on contracts permitting payments inkind based upon the same values, and *263 it concludes that if the beavers are sold at the end of the contract term for $3,500 per pair, the purchaser would realize a cash profit. The analysis does no more than assume its conclusion insofar as fair market value is concerned. Mr. Frost also attempted to justify his valuations by reference to the "long generation of gene pool make-up since the wild, that is capable of reproducing young," and stated "that in itself, in my opinion, makes it worth $3,500 or more." But the same domestic beavers with the gene pool make-up and reproductive capacity described by Mr. Frost were sold by ranchers and owners to Mr. Crum and Mr. Sharp for less than $200. We cannot accept Mr. Frost's conclusions that they became worth $3,500 simply because they were resold on contract. Petitioners' expert Mr. Sharp likewise failed to provide any credible basis for his opinion that the beavers purchased by petitioners had a fair market value equal to their stated purchase prices. He also disregarded the cash transactions, until acknowledging on cross-examination that he was purchasing beavers for cash during the years 1974 through 1978 and was reselling those beavers on contracts. Although Mr. Sharp *264 relied upon his own contract sales (involving approximately 40 transactions), as well as those made by others, he made no attempt to reconcile the prices utilized in those contracts with the cash prices he himself paid. Mr. Sharp also testified that in 1980 he traded beavers for equipment valued at $70,400 and the exchange was based upon beaver values of $3,500 and $2,400 per pair. However, he acknowledged that, after agreeing to the exchange, he found out the equipment "didn't exist" and he never actually received anything for the beaver he purportedly exchanged. This hardly qualifies as an arm's-length transaction which provides any reliable indication of the beavers' value.Other transactions referred to in Mr. Sharp's report including the "Weaver sales" prior to 1970 in our opinion lend little or no support for Mr. Sharp's conclusions without more evidence concerning the details of the transactions. Further, in view of the Securities and Exchange Commission investigation and resulting injunction in the late 1960's prohibiting the Weavers from continuing their sales program, we think the stipulated cash transactions in the 1970's are much more reliable evidence. As in the *265 case of Mr. Sharp, Mr. Crum, petitioners' other expert, placed reliance upon his own contract sales of beavers after 1970 on terms and at stated prices substantially similar to those involved in petitioners' contracts, yet he completely disregarded his own cash purchases which were made to provide a source of beavers he could sell on contract. As in the case of Mr. Sharp, we afford no weight to references Mr. Crum made to pre-1970 sales transactions, including the Weaver transactions. Respondent's first expert, Dr. Hill, is an associate professor of wildlife and fisheries at Mississippi State University. He has studied beaver in the wild and has been involved in programs concerning conservation and control of wild beaver, and, as a part of that program, has studied the marketing of beaver pelts. His knowledge of domestic beavers and beaver ranching operations is limited primarily to visits he made to some of the ranches on two occasions in connection with his preparation of a report and testimony for these cases. While we find Dr. Hill's observations and conclusions helpful by way of background, he did not purport to give an opinion as to fair market value of beavers, at least *266 in traditional fair market value terms, nor did he analyze the purchases and sales in evidence in these cases. Dr. Hill did state the general conclusion that a beaver's value should be primarily related to the value of its pelt, and he concluded that, based upon his estimate of the costs of maintaining the animals, "it would be difficult to make a profit." His conclusions in this regard are of limited use in deciding a reasonable price that would in fact have been paid for ranched beavers based upon transactions that actually occurred and based upon the views and expectations of those involved in the industry concerning the long range reproductive and pelt values of domestic beavers. Likewise, respondent's other expert, Morris Soudack, did not express an opinion as to a price that could be expected to be paid for ranch bred beavers considering the transactions that actually took place and the expectations and objectives of those involved in the industry. Mr. Soudack has been associated with one of the largest fur auction houses in North America, and he has considerable knowledge and expertise concerning the harvesting of wild animals and the marketing of their skins, and we have *267 considered his testimony concerning these matters.However, he, like Dr. Hill, had limited knowledge of the domestic beaver industry and little regard for the economics of domestic beaver ranching.While we share some of his views, particularly those based upon hindsight, as to the probability of domestic beaver producers achieving their stated goals regarding product development, that does not mean that the industry activity, as it actually existed, can simply be disregarded. In arriving at fair market value, we think significant weight should be attached to the evidence concerning cash purchases of beavers occurring during the years 1972 through 1978. While the transactions are many and there is little basis in the record for analyzing the reason for the wide range of cash prices paid, the transactions to provide a basis for setting a realistic ceiling above which beavers would not be expected to sell in an arm's-length transaction unaffected by the payment in-kind provisions of the contracts and the exaggerated tax benefits associated with the contract purchases. We have also given some weight to the cash payments agreed to in connection with petitioners' purchase transactions. *268 In Siegel v. Commissioner,78 T.C. 659 (1982), we viewed the cash principal and interest payments, [18] but not the amount of the inflated purchase price evidenced by nonrecourse notes, as evidence of the fair market value of a movie. We think to some extent the same can be done here, in recognition that the contract purchases of an entire breeding herd might involve some valid distinction from outright cash purchases by those acquiring the beavers for immediate resale. However, we also recognize that, to an extent, even the cash portion of the transactions was inflated in relation to the fair market value because of the tax benefits associated with the exaggerated purchase prices and the payment in-kind provisions.
*269 Finally, we note that respondent made determinations as to value in the deficiency notices as follows: In the cases of Young, Moore, and Coker, $150 and $100 per proven and nonproven beaver, respectively; in the Hartman case, $210 and $144 per proven and nonproven beaver, respectively; in the Bryant case, $75 and $50 per proven and nonproven beaver, respectively; and in the Sypolt and Wohl cases, $87 and $90 per proven and nonproven beaver, respectively. At trial, respondent took the position that the "upper limits" were $150 and $100. Considering the evidence as a whole, we conclude that the fair market value is $200 per beaver for proven animals, $137 per beaver for nonproven animals, and $29 per beaver for yearling animals. [19]
III. Section 183 Objective to Make a Profit
In most of the cases, our previously stated conclusions regarding basis will cause disallowance of *270 a substantial part, if not all, of depreciation deductions and investment tax credits claimed by the petitioners for the years in issue. Therefore, respondent's additional assertion of the lack of profit objective as a reason for disallowing depreciation and investment tax credit will for the most part not be significant as to those matters. Further, the profit objective issue does not enter into the determination of petitioners' allowable interest deductions under section 163. However, it is significant to respondent's disallowance of deductions claimed for feed expenses. Since respondent has conceded that the beavers "existed" and we have concluded that petitioners in fact owned the beavers, the objective to make a profit issue stands as the basis for determining whether the feed expense deductions are allowable or not, as well as our conclusion as to the basis for calculating the interest deduction. See p. 76, supra.
In connection with the objective to make a profit issue, respondent relies upon sections 162, 212, and 183. The application and interpretation of these sections is set forth in our opinion in Lemmen v. Commissioner,77 T.C. 1326, 1339-1340 (1981), *271 as follows: Section 183, on which respondent relies, was adopted as part of the Tax Reform Act of 1969, 83 Stat. 550, to replace the so-called "hobby loss" provisions of section 270. In broad terms, this section imposes limitations on deductions attributable to an "activity not engaged in for profit." See sec. 183(b). As defined in section 183(c), the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable under section 162, relating to expenses paid or incurred in carrying on a "trade or business", or under paragraph (1) or (2) of section 212, relating to expenses paid or incurred for the production of income or for the management, maintenance or conservation of "property held for the production of income." Under this definition--"Whether an activity is engaged in for profit is determined under section 162 and section 212(1) and (2) except insofar as section 183(d) creates a presumption [not here applicable] that the activity is engaged in for profit. [Sec. 1.183-1(a), Income Tax Regs.] In general, deductions are allowable under sections 162 and 212(1) or (2) where a taxpayer, irrespective of whether others *272 might view his expectations as reasonable, has engaged in an activity with the objective of making a profit. Lamont v. Commissioner,339 F.2d 377, 380 (2d Cir.1964), affg. a Memorandum Opinion of this Court; Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Jasionowski v. Commissioner,66 T.C. 312, 318-319 (1976). The courts have used words such as "basic", "dominant", "primary", "predominant", and "substantial" to describe the requisite profit motive. Lamont v. Commissioner,supra, at 380, n. 4; Hirsch v. Commissioner,supra, at 736; Godfrey v. Commissioner,335 F.2d 82, 84 (6th Cir. 1964), affg. a Memorandum Opinion of this Court; Allen v. Commissioner,72 T.C. 28, 33 (1979). The issue is one of fact to be resolved not on the basis of any single factor, but in light of all the facts and circumstances. Allen v. Commissioner,supra at 34. [Footnote refs. omitted.] Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity *273 is engaged in for profit, and these factors have been applied by this Court in resolving the issue. See, e.g., Fox v. Commissioner,80 T.C. 972 (1983). The factors include (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisory; (3) the time and effort expended by the taxpayer in carrying on the activities; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other or similar activities; (6) the taxpayer's history of income or losses with respect to the activities; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. As in numerous prior cases involving socalled tax shelters, respondent contends that petitioners in these cases entered into their beaver purchase agreements and carried on activities relating to the beavers to obtain tax deductions and not to make a profit. See, e.g., Lemmen v. Commissioner,supra;Hager v. Commissioner,supra;Brannen v. Commissioner,supra; *274 and Siegel v. Commissioners,supra.
Without question, the perceived tax benefits of purchasing and maintaining a beaver herd on the terms proposed to petitioners by their sellers and tax advisors were important to petitioners' decisions to undertake their investments. We think petitioners in their trial testimony discounted the significance of the prospective tax benefits to them. But while an activity engaged in solely to reduce Federal income taxes is not considered to be engaged in for profit, neither does a tax avoidance purpose itself establish that a taxpayer does not have an honest objective to make a profit. Hager v. Commissioner,supra at 785. The statement we made in Lemmen v. Commissioner,supra at 1346, puts the tax savings motivation in perspective: As respondent apparently recognizes, the tax consequences of true business transactions are a legitimate and, often, paramount concern of the interested parties. The tax law, itself, contains many provisions, including the provisions for accelerated depreciation and the investment credit, designed to encourage certain courses of business or investment *275 activity. In contending that petitioner purchased the cattle "primarily to benefit from the tax savings", however, respondent seems to suggest that an activity may be considered as "not engaged in for profit" if it appears that tax reasons affected the decision to enter into the activity, as opposed to some other moneymaking venture. Section 183 does not go this far; it must be reconciled with the principle that a taxpayer has the right to engage in a venture which has economic substance even though his motivation in the early years of the venture may have been to obtain a deduction to offset taxable income. [Citations and footnote refs. omitted.] Aside from emphasizing the tax shelter features of the investment, respondent attempts to make much of his view that petitioners' expectations, as well as those of the individuals involved in the industry, were unreasonable as regards the economics of domestic beaver ranching. But, as stated in the authorities cited above, the issue is not whether petitioners or those in the industry had a reasonable expectation; it is sufficient if there was a bona fide objective of making a profit. Moreover, hindsight analysis as to the probability *276 of making a profit in beavers during the periods in issue is of limited or no use since the test is one of subjective intent at the time the transactions were entered into, not objective hindsight. See Smith v. Commissioner,78 T.C. 350, 392, n. 32 (1982).[20] More significant is the objective evidence [21] concerning the activities of petitioners and those involved in the beaver ranching industry prior to and during the years in question. Looking to the evidence concerning the activities of petitioners and those involved in beaver ranching at the *277 time petitioners made their investments, we agree with respondent that the financial projections supplied prospective investors (including petitioners) raise substantial questions about the bona fides of investors' stated profit objectives. Although the projections in evidence all follow the same format, the actual figures utilized vary significantly with corresponding variations in the "bottom line" profit and loss figures. Unfortunately, there is very little in the record by way of explanation by the projections or of the interpretation and use made of them by petitioners and their advisors. However, some generalizations can be drawn. Each projection covers an 11 or 12-year period, corresponding with the year the herd is originally purchased through the year that the purchase contract is paid off. Consistently, the projections show large income tax losses, and tax savings, during the first 7 years. This is attributable to the fact that there are no revenues projected during the first 4 or 5 years because the herd is being bred and built up in size; at the same time, cash expenditures are made for contract interest and principal payments, and for feed; and the original purchase *278 cost (based upon values of $3,500 and $2,400 per pair) is depreciated over the period. Cash flow remains positive through the first 4 to 5 years only because of the sizeable income tax savings from investment tax credit in the first year and operating losses through the period. After that, cash flow increases, while tax savings diminish (to zero after 7 years) as revenues exceed expenses from the fourth or fifth year through the end of the period covered, and as contract principal payments can be made with beaver. All this would perhaps not be at variance with the pattern anticipated for many new and somewhat speculative business ventures, but the actual numbers reflected in the projections deserve scrutiny. In this respect, the income tax losses during the first 7 years substantially exceed the taxable profits during the last 4 or 5; likewise, if tax savings and tax costs are eliminated entirely, cash flow deficits during the early years exceed cash flow surpluses from operations in later years in the case of six of the eight projections used by petitioners in these cases; in the case of Coker, the projection would result in a net cash profit of approximately $13,000 and in Moore's *279 case, $16,500. But, on the other hand, the projections show sizeable herds as of the end of the period covered which are then producing significant profits. Further, each projection shows the revenue that would be produced if the owner killed off the entire herd at that time and sold the pelts at prices ranging from $65 to $81 per pelt. As respondent points out, if the total net profit (exclusive of taxes) anticipated by each petitioner is limited to that shown on the projections as being produced from operations over the period of the purchase contract and the "liquidating value" of the herd at the end of the period, the projection for five petitioners would show a net profit ranging from $3,600 (Wohl) to $38,000 (Moore). There would be a net loss for three of the petitioners (Bryant, Hartman, and Sypolt). However, that appears to be due at least, in the case of Bryant and Sypolt, to the fact that their projections, unlike the others, deduct principal payments from cash flow in later years of the contract, even though the payments can then be made in-kind. Of course, unlike the analysis above, the projections actually take into account tax savings in illustrating forecasted *280 profits to the investor. But, in evaluating the profit objective aside from tax savings, it can be argued that the projections show, at best, that the purchase and maintenance of the herd was anticipated to do little more than break even economically. However, although the matter is not free from doubt, we do not believe the projections should be taken to mean that petitioners were told and understood that the best they could do, economically, was maintain the herd for 11 or 12 years and realize the profits earned from operations up to that time plus the liquidating value of the herd. We think it is more reasonable to conclude that the projections simply cut off the analysis at the end of the contract period and show the prospective investor the result if he chose to cease operating and kill off the herd at that time. Obviously, if the breeding herd were making the annual profit assumed in the prospectuses by the end of the contract period, the investor would consider continuing operations or selling the beaver as a breeding herd. In short, we think the projections can and should be viewed as presenting a profit potential, aside from tax savings. But, more sigificantly, the evidence *281 shows that petitioners showed concern for more than tax savings. All petitioners either themselves or through others obtained information concerning beaver ranching and marketing from individuals who had been associated with the industry for many years, including Mac Roundy, Jerry Milligan, Dennis Crum, and Paul Sharp, and from visits to the ranches, offices, and recordkeeping facilities of the marketing organizations. Indeed, petitioner Young, who at the time of entering into his beaver purchase transaction had established a successful poultry operation involving some 22 ranches and over 1 million laying hens, spent considerable time personally inspecting the ranches, interviewing the ranch managers concerning all facets of the operation, and inspecting the business offices and recordkeeping operations. Likewise, petitioners Moore and Sypolt made personal inspections of the ranches, and petitioners Coker, Bryant, and Hartman discussed the matter with other owners or individuals who themselves were personally familiar with the beaver operations. This was simply not a situation where petitioners viewed an opportunity to obtain large tax savings with a relatively small cash outlay, *282 and were unconcerned about the economics of the venture. To be sure, the marketing activities of those making contract sales of the beavers were questionable, particularly as regards the exaggerated purchase prices and represented tax benefits. But there were also persons associated with the industry who had for many years devoted their energies towards making domestic beaver ranching a profitable activity. We note particularly in this regard the fact that two of the principal ranch supervisors and managers, Mac Roundy and Jerry Milligan, had spent most of their adult lives and made their livelihoods developing the ranches and attempting to make the breeding and marketing of beavers a profitable activity. Much effort was devoted to development and design of pens, food, breeding, and recordkeeping from the 1950's through the 1970's. We have considered respondent's arguments that the feed costs, pelt values, and reproductive rates assumed in the projections were unrealistic and therefore even the profit figures shown in the projections should be disregarded. We agree that, particularly with hindsight analysis, these factors were, to say the least, presented in the most optimistic *283 light.But we do not believe the evidence shows that petitioners did not believe that in the long run the industry was capable of achieving the goals assumed in the projections. Not surprisingly, respondent places considerable reliance upon the "bottom line" lack of success of the marketing and sales activities carried on, on behalf of petitioners and other beaver owners, by WBBCA and WBF. Without question, these efforts did not produce dramatic results in terms of profit, a factor which is best illustrated by the lack of any significant revenues reported by petitioners in these cases on their tax returns with respect to their beaver breeding activities. But while emphasizing a lack of positive results, respondent simply overlooks the significant fact that continued and substantial efforts were made to develop a marketing and distribution system for domestic beaver pelts and their products. One could certainly conclude that the individuals promoting beaver raising and breeding were unduly optimistic as to the likelihood of succeeding in developing a product and market that could custain a reasonable profit in the long run. But undue optimism alone does not support a finding that *284 there is not an honest objective to make a profit. Petitioners do not dispute that the industry was, throughout the 1970's, highly speculative in terms of its ultimate success. But the requirement that taxpayers have an objective to make a profit in order to be entitled to deductions in excess of income received from an activity has never been intended to preclude tax deductions with respect to highly speculative activities. Fox v. Commissioner.80 T.C. 972, 1017 (1983). Respondent also places considerable reliance, in connection with his argument that petitioners did not have a profit making objective, upon the fact that the beavers' purchase price was inflated. Certainly the fact that the prices were inflated, as we have found, illustrates the significance of the tax shelter aspect of petitioners' beaver investments. But the payment inkind provisions of the contract and notes made the economics of the purchase agreements much more palatable, in spite of excessive prices. In this respect, unlike cases involving nonrecourse indebtedness and inflated prices where the possibility of the taxpayer realizing anything if the venture involved were successful is virtually *285 nil because the inflated indebtedness would absorb most of the revenue or appreciation in value to the extent it does occur (see, e.g., Hager v. Commissioner,76 T.C. 759, 784; Brannen v. Commissioner,78 T.C. 471, 493 (1982), on appeal (11th Cir., Aug. 23, 1982); Fox v. Commissioner,80 T.C. 972 (1983)), the payment in-kind provision involved in these cases made it possible for petitioners to pay the majority of the stated price by simply surrendering somewhat less than the same number of adult beavers they had acquired in the first place.So long as the beavers were valued for payment purposes the same as they were valued in connection with the determination of the purchase price, the value utilized was of minimal economic significance. Of course, the greater the purchase price, the higher the cash interest payments required of the purchasers, but this factor was mitigated by the arrangement, in the case of most petitioners, that interest was payable only during the first few years of the contract or, in any event, the total interest obligation could be reduced substantially by payments in-kind. Further, whether the reproduction *286 rates set forth in the prospectuses (which, we agree with respondent, were in excess of actual experience and, at the very least, optimistic) or the actual kit production rates are utilized, the herd could reasonably be expected to produce sufficient numbers to have an adequate supply of beaver to pay off the contract and still maintain breeding animals and a supply of marketable pelts. Respondent questioned at trial whether petitioners would have entered into their contracts if the contracts called for all of the principal to be paid in cash, rather than most of it being payable in-kind. But the fact of the matter is that the contracts did not require full cash payment, and that arrangement certainly did not detract from the economic viability of the venture.In fact, to the extent the valuations utilized for purposes of reducing the principal by in-kind payments exceeded the cash value of the beavers, the ability to pay in-kind was obviously beneficial to the purchaser (wholly aside from tax implications). Another factor significant to the profit objective issue is the continuing commitment petitioners undertook at the time they purchased their herds to maintain and care for *287 the animals after the initial purchase. Our findings set forth the annual payments petitioners made for feed, which are obviously significant, and, for the most part, were made when due. Further, the evidence establishes, and respondent does not dispute the matter, that the amounts paid for feed and maintenance of the animals were not in substance disguised payments that petitioners made only to increase the tax benefits. Respondent apparently would have us go so far as to conclude that petitioners paid thousands of dollars for the feed and care of their animals, and had professionals supervise the breeding of the animals, cull the undesireable ones, pelt portions to the herd, and attempt to market the pelts primarily to keep the venture afloat solely for the realization of tax savings. We do not think the objective facts support this conclusion. Finally, there quite obviously was no element of personal pleasure or recreation derived by petitioners from their beaver venture.All petitioners were relatively high income taxpayers and, as previously discussed, they unquestionably recognized the sizeable projected tax savings of their investment. They were perhaps overly optimistic *288 and gullible in accepting the views expressed by those involved in the industry, that, in the long range, domestic beaver ranching could be made a profitable venture.That is certainly the situation in hindsight. But we think the manner in which the ranches and service organizations carried on their activities, as well as the efforts and resources expended by petitioners after acquiring their herds establishes that petitioners honestly believed that in the long run the herds would be valuable and profitable, at least through the years here in issue. IV. Webber Purchase Date
Respondent argues that petitioner Webber is not entitled to any credits or deductions claimed for 1977 because Webber's purchase of beavers was not made until 1978. To the contrary, we have found as a fact that Webber's purchase contract was entered into in December 1977, and that the initial payment on the contract of $10,033 was made by check on December 27, 1977. Respondent's position is that we should reject Mr. Webber's own testimony on the matter and find that the check dated December 27 was not in fact written until 1978 solely because petitioner's ex-wife (who did not testify) recorded the check *289 in the family checkbook after a deposit dated in the checkbook as January 5, 1978. Respondent concludes that the "logical inference" of the sequence of recording these two transactions is that the check was written after January 5, 1978.
We do not agree. We find Mr. Webber's testimony credible on this issue and conclude that the mere sequence in which the check was apparently recorded by his ex-wife does not justify rejecting his testimony and finding the check was back-dated. Petitioner Webber is entitled to the investment tax credit, interest, and depreciation for 1977 resulting from our previous findings. V. Attorney Fees
Petitioners request that the Court award them attorney fees. This Court has no jurisdiction to award attorney fees in cases instituted prior to March 1, 1983. Odend'hal v. Commissioner,80 T.C. 588, 618-619 (1983); McQuiston v. Commissioner,78 T.C. 807 (1982), affd. 707 F.2d 1082 (9th Cir. 1983). VI. Investment Tax Credit Recapture
Respondent asserted either in his deficiency notice or Amendment to Answer that petitioners Bryant, Moore, Sypolt, and Young made dispositions of purchased beavers *290 during the years in issue and are therefore liable for recapture of a portion of investment tax credit claimed on the beaver for the year of purchase.In the case of petitioners Hartman, Webber, and Wohl, respondent likewise asserted that dispositions took place which require recapture, and the year of purchase is included in the deficiency years before the Court. The parties stipulated at trial as to the amount of recapture in the Young case. With respect to the remaining cases, petitioners do not dispute respondent's proposed findings of fact as to the number and identity of beavers which died, were sold, or otherwise disposed of. However, petitioners make two arguments with respect to their liability for recapture of investment tax credit regarding the animals which ceased to exist during the taxable years in issue. First, with respect to the animals disposed of after the first year following petitioners' purchase of them, petitioners admit recapture of investment tax credit is appropriate, and they make no argument that respondent has incorrectly determined the amount to be recaptured. They only argue that there should be a "corresponding deduction" in the amount of the *291 remaining basis in the animals disposed of. The question as to whether petitioners must recapture investment tax credit is clearly separate and distinct from the question as to whether and to what extent petitioners are entitled to a loss deduction with respect to animals disposed of. As to the former question, petitioners have in essence conceded the issue, and, aside from their concessions, we agree with respondent that recapture is required. As to the latter question, we note the existence and amount of loss would appear to depend upon the type of disposition, i.e., whether it was a death, pelting, or sale of the live animal. Petitioners have not before raised the issue as to whether they are entitled to losses not claimed on their returns for beavers disposed of, and we will therefore not consider the issue here. It would be especially inappropriate for us to consider the issue in view of the fact that not only did petitioners fail to raise this issue in their pleadings, at trial, or in their opening brief but, even when the matter is raised in their reply brief, they simply make the generalization that they should be entitled to deductions with respect to beavers disposed *292 of, with no analysis of the actual facts concerning the dispositions nor the applicable law. Second, petitioners do contest their liability for recapture of investment tax credit in the case of beavers dying during the first year of petitioners' ownership where the lost beavers were replaced by the seller or rancher involved. Petitioners argue that where their beavers died during the first year and were replaced with animals "similar or related in service or use" an involuntary conversion occurred within the meaning of section 1033 and therefore there is no a "disposition" within the meaning of section 47(a). Section 47(a) requires recapture where investment credit property is disposed of or "otherwise ceases to be section 38 property with respect to the taxpayer" before the end of the period taken into account in computing the credit under section 38. As section 47 now applies, and as it applied during the years here in issue, exceptions to the recapture provisions of section 47(a) include a transfer by reason of death, certain corporate acquisitions, certain ConRail exchanges, and a "mere change in form of conducting the trade or business." See sec. 47(b). There is simply *293 no exception for the death of livestock upon which the credit was claimed followed by a replacement of the livestock. Petitioners appear to be relying upon former sections 47(a)(4) and (5) which applied to property destroyed by casualty and certain property disposed of and replaced by property similar or related in use. These provisions were repealed and have not been effective since 1971. See also H. Rept. No. 92-533, 92d Cong., 1st Sess., p. 28 (1971), 1972-1 C.B. 512; S. Rept. No. 92-437, 92d Cong., 1st Sess., pp. 42-43 (1971), 1972-1 C.B. 582-583.
We sustain respondent's assertion that petitioners' tax liabilities must be increased under section 47(a) with respect to the animals which died, were pelted, or were sold or exchanged during the taxable year. VII. Ordinary Income or Capital Gain on Sales by Sypolt and Webber
During 1977 and 1978, petitioner Sypolt sold portions of his beaver herd to other investors. The 1977 sale, as reported on his return, was for a total price of $40,779. Having elected to report the sale on the installment basis, $2,307 was reported as capital gain on the 1977 return. The 1978 return reported another installment *294 sale for a price of $49,385, and a 1978 reported gain of $2,099. Petitioner Webber sold animals from his herd during 1979 for a stated price of $37,442, and reported long-term capital gain from the installment sale of $491 on his 1979 return. The sales by both Sypolt and Webber included some of the animals involved in their original herd purchases, some animals received as death loss replacements, and some raised beavers including kits under 1 year old. In his Amendment to Answer in both cases, respondent asserted that the entire gain from the sales are ordinary income. Since this clearly amounts to a new matter not covered by the adjustments set forth in the deficiency notices for Sypolt and Webber, respondent has the burden of proof. Rule 142(a). We conclude respondent has not satisfied his burden in both cases. Section 1231(b)(3) provides for capital gain treatment for gain resulting from the sale of livestock (other than cattle and horses) held by the taxpayer for breeding purposes, and held for 12 months or more.Whether an animal is held for breeding purposes within the meaning of the statute is a factual question to be determined from all the facts and circumstances, *295 including the actual use of the animal and the reasons for taxpayer's disposal of it. See sec. 1.1231-2(b); Income Tax Regs; McDonald v. Commissioner,23 T.C. 1091 (1955). Notwithstanding section 1231, section 1245 requires ordinary income treatment for the amount of prior depreciation deductions taken (not exceeding the amount realized from the sale). Wholly aside from respondent's having the burden of proof, we reject respondent's contention that the animals sold were not held for breeding purposes because the animals were purchased and held solely for tax savings and not for use in a trade or business. With respect to the applicability of section 1245, we agree with respondent's legal analysis but we conclude the record is simply insufficient to determine, on a per animal basis with respect to the animals sold, the amount realized on the sale and the prior depreciation taken, if any, on all but original herd proven and nonproven beavers. Although the ranch computer records identify the animals transferred in connection with the sale, and they identify the animals included in the original herd purchase, depreciation was taken on a composite basis and, likewise, *296 the tax return for the year of sale simply reports the sale on a lump-sum basis. We would be speculating, for example, on the basis of this record, if we were to determine depreciation taken on animals that were included as kits with the original purchase (for which there was no consideration stated in the purchase transaction) or animals that were received as death loss replacements for original herd animals. Likewise, we have been provided no factual basis for allocating the total amount realized on the sale among the individual animals. Although we agree that the kits held for less than 12 months would not qualify for section 1231 treatment, there is no reasonable basis for allocating part of the total sales price to the kits. We do note that our prior valuation conclusion and respondent's valuation argument would indicate the kits have a minimal value. Finally, the record is also deficient regarding facts relative to the purposes for which the animals sold were held by petitioners Sypolt and Webber. There is evidence in the record that the ranchers recommended pelting of animals which were mated but did not produce offspring, and there is evidence that the herds of both *297 petitioners were used for breeding purposes. The mere fact of a sale and of taxpayer's willingness to sell does not prove the animals were held for sale. We are not deciding on the basis of the record that the animals sold in fact meet the requirements of section 1231. We do hold that the few facts in this voluminous record that shed light on this specific issue are insufficient for respondent to carry his burden of proof. VIII. Petitioner Sypolt's Base Period Income for Income Averaging Purposes
In his reply brief, petitioner Sypolt agreed with respondent's position that for purposes of determining petitioner's tax for 1976 and 1977 under the income averaging method, his 1975 deductions for beaver depreciation, feed, and interest must be adjusted in accordance with our determination on these matters for the years here in issue. Accordingly, Sypolt should for this purpose be allowed his 1975 feed deduction; and depreciation and interest should be calculated in accordance with our findings in part II of this opinion. IX. Additions to Tax
Section 6653(a) provides for a 5-percent addition to tax if any part of an underpayment is due to negligence or intentional *298 disregard of the rules and regulations. In Bryant's case, respondent's deficiency notice determined the addition to tax applies for all years covered. In the Hartman, Sypolt, Webber, Wohl, and Young cases, the issue as to petitioners' liability for the addition to tax was raised in respondent's Amendment to Answer. Accordingly, only Bryant has the burden of proof on this issue. In the other cases, the addition to tax amounts to a new matter upon which respondent admits he has the burden of proof. Rule 142(a). As to petitioner Bryant, we agree with respondent that he has failed to prove respondent's determination is in error. He admitted (prior to the issuance of the deficiency notice) that none of the income from the sale of beavers to Wohl was reported on his 1978 return. For all 3 years in issue, he failed to report investment tax credit recapture with respect to purchased beavers disposed of. He provided no explanation at trial for these omissions. Similarly, although respondent has the burden of proof as to petitioners Sypolt, Wohl, Webber, and Hartman, we conclude they too are liable for the additions to tax for the years in issue during which they disposed of purchased *299 proven and nonproven beavers (through death loss, pelting, or sale) but reported no investment tax credit recapture. For Sypolt, this includes all years in issue; for Wohl, 1979 and 1980; for Webber, 1978 and 1979; and for Hartman, 1976 through 1978. Except for Hartman, who reported in one of the years in issue (1978) recapture with respect to four of eight animals disposed of for which recapture is required, and Coker, who reported recapture with respect to the beavers, none of the petitioners reported any investment credit recapture. They admitted to the dispositions determined by respondent, which were taken from their own computer ranch records (and which they argued were carefully maintained throughout the years in question). All were sophisticated businessmen and, except for Webber, were tax professionals themselves.They were at least negligent in failing to comply with the rules and regulations and report their recapture liabilities. Regarding years for which respondent asserted the addition to tax but investment tax credit recapture does not apply, and for all years in issue for petitioner Young, [22] we believe respondent has failed to carry his burden as to the addition *300 to tax. While respondent does not object to petitioners' proposed findings of fact that they had no knowledge of what their sellers had paid for beaver in relation to their (petitioners') stated contract prices, respondent nevertheless assumes petitioners knew they were not entitled to use the stated price as a basis for investment tax credits, depreciation, and interest. As we previously discussed, the issues as to basis and fair market value are to be resolved based upon objective facts, not petitioners' subjective beliefs. But that is not the case with respect to the addition to tax. We have considered respondent's various other technical arguments as to improper reporting by petitioners, some of which were not even raised as substantive issues by respondent but which respondent seeks to assert as a basis for sustaining the addition to tax: [23] There *301 is little, if any, testimony on these matters.Considering the burden of proof is on respondent we think that, on the basis of this record, petitioners should prevail on the additions to tax except for the years they had unreported investment tax credit recapture. X. Amount of Gain Resulting From In-Kind Contract Payments
As noted in our findings of fact, petitioners Young and Coker made in-kind payments on their contracts and notes during the years in issue, and they reported long-term capital gain on their returns for the years involved in the amount of the stated principal and interest obligations reduced by the payments. In view of our conclusion that the in-kind portion of the contracts and notes was artificially inflated to the extent it exceeded the beavers' fair market values, such that *302 depreciation, investment tax credits, and interest cannot be calculated by reference to the excessive values, it follows that neither should gain be recognized in connection with the in-kind payments in excess of the fair market value of the beavers used to make the payments. Respondent took this position in his pretrial memorandum, although he contended that "tax benefit principles and the duty of consistency" require that the amount of gain recognized as a result of payments in-kind should reflect depreciation allowed for years prior to those here in issue, as well as depreciation allowed by our opinion concerning the years before the Court. Petitioners did not address the matter at trial nor in their briefs. Accordingly, we conclude that petitioners have conceded respondent's position and that in the Rule 155 calculation the parties should make the appropriate adjustments to the gain recognized by petitioners on their returns. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert D. Young and Barbara J. Young, docket No. 18431-81; Michael G. Sypolt and Darlene B. Sypolt, docket No. 27393-81; Foy Bryant and Kathryn Bryant, docket No. 27409-81; Harvey E. Hartman and Bevery J. Hartman, docket No. 29564-81; Glenn A. Coker and Charlotte K. Coker, docket Nos. 31096-81 and 24614-82; Emmett L. Moore and Anne R. Moore, docket No. 31099-81; and Alvin R. Wohl and Donna Wohl, docket No. 7228-82.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. Pursuant to the order of assignment and on the authority of the "otherwise provided" language of Rule 182, Tax Court Rules of Practice and Procedure↩, the post-trial procedures set forth in that rule are not applicable in these cases.
4. The discrepancies between the figures in the following table and the schedule of payments made by petitioners are unexplained.↩
5. The discrepancies between the figures in the following table and those in the table above are unexplained.↩
1. The stipulation and testimony does not disclose the feed payments made for 1975 and 1976, and there is no explanation in the record for the difference between the stipulated feed payment and the amount deducted for 1977. Since respondent makes no argument that the amounts claimed as feed expenses were not in fact paid, we need not address the apparent discrepancy.↩
6. The discrepancies between the figures in the following table and the table above are unexplained.↩
1. The stipulation and testimony does not disclose the feed payments made for 1975 and 1976, and there is no explanation in the record for the difference between the stipulated feed payment and the amount deducted for 1977. Since respondent makes no argument that the amounts claimed as feed address the apparent discrepancy.↩
7. Prior to issuance of the deficiency notice, petitioners agreed to disallowance of the balance of the depreciation regarding their beavers claimed on their 1975 return.↩
8. The discrepancies between the figures in the following table and the table above are unexplained.↩
9. The matter of ownership is discussed further beginning at page 78, infra.↩
10. In addition to the grounds relied upon by respondent that are hereinafter discussed, we note that in his opening brief respondent asserted that, as an alternative ground for disallowing some or all of the losses claimed by petitioners with respect to their purchase and ownership of beavers, sec. 465 and its "at risk" limitations apply. Other than this reference to the applicability of sec. 465, respondent made no argument concerning sec. 465 until his reply brief. Respondent attempted to justify raising an extended discussion and argument on this matter for the first time in his reply brief by stating in his brief that the Court denied his request for an extension of time to file his opening brief. In point of fact, by order dated Mar. 28, 1983, the Court extended the time for all parties to file original briefs from Apr. 8 to Apr. 22, 1983. On or about Apr. 22, 1983, respondent's counsel telephoned the Court and requested a second extension on behalf of all parties. No reasons were given as to why the second extension request was being made. The Court denied the request. Aside from any difficulties encountered by respondent in articulating his position on the sec. 465 issue, it is apparent from respondent's proposed additional findings of fact and argument on this matter in his reply brief, that the applicability of sec. 465 to these cases involves both factual and legal issues which were not raised by respondent in his deficiency notice, Amendment to Answer, pretrial memorandum, or during trial. In these circumstances we will not consider the issue. See Riss v. Commissioner,57 T.C. 469, 474 (1971); Horvath v. Commissioner,59 T.C. 551↩ (1973). It would be particularly inappropriate for us to do so in view of the fact that respondent's proposed findings of fact and argument on this matter were asserted for the first time in his reply brief. A reply brief, by its very nature, should be limited to matters covered in the opponent's opening brief.
11. Webber, Hartman, and Wohl include disallowance of investment credits claimed on their returns for the years of purchase. In the remaining cases, investment tax credits were claimed on petitioners' tax returns for years prior to those covered by the notices of deficiency. ↩
12. The test has been stated both in terms of the relationship of the purchase price to value and of the principal amount of the purported indebtedness to the property's value. See Fox v. Commissioner,80 T.C. 972, 1019. We need not resolve in this case which test is correct since our conclusions do not depend upon the indebtedness involved here being considered nonrecourse. We also note that the application of the above-cited cases to tax shelter transactions involving nonrecorse indebtedness has been held by this Court to be unaffected by the Supreme Court's recent opinion in Commissioner v. Tufts,461 U.S.    , 51 U.S.L.W. 4518 (May 2, 1983). See Fox v. Commissioner,supra↩ at 1023 n. 25.
13. Consistent with the opinion in Lemmen v. Commissioner,77 T.C. 1326 (1981), this Court in Regan v. Commissioner,T.C. Memo. 1982-733↩, held that petitioner's basis in cattle should be limited to fair market value and that the excess of the stated purchase price over value should be considered as being attributable to the maintenance contracts involved.
14. In their brief, petitioners cite Irvine v. Postal Telegraph Cable Co.,37 Cal. App. 60, 173 P. 487 (1918), for the notion that, under California law, "a contract providing for payment in property is enforceable and the obligation becomes one for payment of money if the payment is not made on the due date." We agree with petitioners that the cited case stands for the proposition that a contract providing for payment in other than money is enforceable.But we disagree with the inference petitioners apparently seek from the case that a purchaser agreeing to pay in-kind is, upon his failure to do so, liable as a matter of law to pay money equal to the stated contract price. In this regard, the plaintiff in Irvine contracted to grant defendant an easement across his property for $1,500 cash, or, at the option of plaintiff, in telegraph privileges worth $1,500. After plaintiff performed his part of the bargain, it became unlawful for telegraph companies to pay in the form of privileges. The Court held that upon the company's failure to deliver the privileges when requested, the contract became one to pay the sum of money designated in the contract "because the amount of money named in the contract was the exact equivalent of the value of the telegraph privileges which the obligor was compelled to furnish." Irvine v. Postal Telegraph Cable Co.,supra at 488. In contrast, the amount of money named in the contracts involved in these cases was nowhere near the value of the property petitioners could furnish as payment.↩
15. It is appropriate at this point to explain the difference between the amount of basis for the purpose of calculating depreciation and investment credit (the fair market value of the beavers) and the amount upon which interest deductions are to be calculated (the cash principal portion of the contracts and notes, if any, plus the fair market value of the beavers to the extent that beavers could be used in payment of the stated amounts). Basis is determined by what is paid for the property (in this case, the beavers) and not what is paid for something else (in this case, the anticipated tax benefits). Interest is the amount paid for the use or forebearance of money (in this case, the beavers and the anticipated tax benefits). The fact that a portion of the indebtedness represents tax benefits which are not realized does not prevent that portion from being taken into account in determining the amount upon which an interest deduction is calculated provided, as is the case herein, that the amount owed for those benefits in fact represents a bona fide indebtedness and there is a bona fide objective to make a profit aside from the tax benefits. ↩
16. In the case of one petitioner (Young), interest as well as principal could be paid in-kind, and payments in 1976 and 1977 were made as interest by delivering beaver to the sellers. However, taking into account the cash payment made by petitioner Young for 1974 and deducted as interest for that year ($24,283), there is clearly no "interest" due in accordance with our method of calculation for 1976 and 1977.↩
17. Petitioners' argument on brief that the United States and California State constitutional limitations upon governmental impairment of contracts restrict our authority to determine tax consequences by reference to substance rather than form is patently without merit. We are not "reforming" petitioners' contractual obligations. We are simply deciding, based upon an objective evaluation, the substance of what petitioners purchased and agreed to pay, and the tax consequences of these determinations.↩
18. We concluded in Siegel v. Commissioner,78 T.C. 659↩ (1982), that while payments were designated as "prepaid interest," to the extent that the interest was based upon a nonrecourse note and inflated value, it should be characterized as additional principal. Similarly, cash payments designated as interest but exceeding what we conclude can realistically be viewed as such should be characterized as additional principal payments in these cases.
19. The evidence indicates that there was no material variation in the fair market value of beavers throughout the period (1973-1980) during which the petitioners entered into their purchase contracts. Accordingly, our findings as to value applies throughout the years involved in these cases.↩
20. In this respect, both parties place considerable emphasis upon the sale of pelts to Neiman-Marcus in 1982, and each side to this controversy argued that the results of the sale supports his position on the profit objective issue. However, the results of the Neiman-Marcus transaction shed little light upon petitioners' objectives during the years 1975 through 1980. ↩
21. Petitioners' own conclusory and self-serving testimony that they intended to make a profit from their investments is to be afforded limited weight in resolving the issue. See Flowers v. Commissioner,80 T.C. 914, 941↩ (1983).
22. The parties stipulated Young had investment tax credit recapture of $245 for one year. This relatively insignificant amount does not compare with the frequent and more substantial liabilities disregarded by the other petitioners and does not, in itself, warrant a finding that the addition to tax applies in Young's case.↩
23. For example, respondent argues that part of the purchase prices should have been allocated to the kits included with the original herd purchases, and that the kits do not qualify for investment tax credit or depreciation in the year of purchase. The record does not support a finding that petitioners in fact paid anything for the kits or that they had any significant value.↩